AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
& others vs. COMMISSIONER OF INSURANCE.

Suffolk. October 7, 1977. — January 5, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & ABRAMS, JJ.

*Insurance,* Motor vehicle liability insurance, Commissioner of Insurance.
*Due Process of Law,* Insurance regulation. *Constitutional Law,* Obli-
gation of contracts, Police power, Equal protection of laws. *Statute,*
Retroactive statute.

The enactment of St. 1977, c. 365, requiring all insurers in Massachusetts
to rewrite certain automobile insurance contracts issued in 1977 retro-
active to January 1, 1977, at reduced rates, was a proper exercise of
the police power and did not constitute an unreasonable impairment
of the obligation of the insurers' contracts with their insureds or de-
prive the insurers of property without due process of law. [187-197]


CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on July 21, 1977.

The case was reserved and reported by *Liacos,* J.

*Acheson H. Callaghan, Jr. (Jeffrey Swope* with him) for
the plaintiffs.

*S. Stephen Rosenfeld,* Assistant Attorney General (*Mit-
chell J. Sikora, Jr. & Terry Jean Seligmann,* Assistant At-
torneys General, with him) for the defendant.

*John G. Ryan,* for Metropolitan Property and Liability
Insurance Company, intervener, submitted a brief.

HENNESSEY, C.J. On July 21, 1977, the plaintiff motor
vehicle insurance carriers filed a complaint in the Supreme
Judicial Court for the county of Suffolk seeking declaratory
and injunctive relief from the operation of St. 1977, c. 365.
The contested statute requires the plaintiffs, and all other
insurers in Massachusetts, to rewrite certain automobile in-
surance contracts issued in 1977 retroactive to January 1,
1977, at reduced rates. The plaintiffs contend that the

statute, in so far as it has retroactive effect, is unconstitutional. The plaintiffs' motion for a preliminary injunction was heard before a single justice on August 1, 1977, and was denied, with a brief memorandum of opinion, on August 3, 1977. Thereafter, a stipulation as to the facts was filed by the parties on September 16, 1977, and the single justice reserved and reported the case to the full court.

Chapter 365 contains three distinct rebate provisions. Section 4 requires a reduction in the premiums charged on policies reinsured in the Massachusetts Motor Vehicle Reinsurance Facility (the Facility rebate). Section 5, cl. 1, requires reductions in the premiums charged policyholders in Chelsea and Revere (the Chelsea-Revere rebate). Section 5, cl. 2, requires a reduction in the premium of any person whose premium increased more than 25% in 1977 (the 25% cap).

Additionally, § 6 of c. 365 requires any policy affected by the act to be "amended by endorsement retroactively as of its effective date to the revised rates and premiums" required by the act. Sections 4 and 5 prohibit companies from making any other adjustment in the rates, and § 6 provides that "[a]ny premium loss suffered by an insurer as a result of its compliance with the provisions of this act shall not be used as a factor in calculating future motor vehicle insurance rates for said insurer."

The defendant Commissioner of Insurance (Commissioner) estimates that, as a result of the operation of c. 365, the total amount to be credited by all companies to policyholders is between $45,000,000 and $55,000,000. The plaintiff companies (who do not include "all companies") estimated that their 1977 premium revenues are $360,000,000 and that the approximate amount of premiums to be refunded under the act is $1,100,000 for Chelsea and Revere policyholders, $9,000,000 for the Facility insureds, and $6,200,000 for the 25% cap. The plaintiffs thus argue, first, that c. 365 deprives the companies of "vested" property interests in premium rates in violation of the due process clauses of the Fourteenth Amendment and of arts. 1, 10 and

12 of the Declaration of Rights of the Massachusetts Constitution; second, that the statute impairs the obligation of contracts between company and policyholder in violation of art. 1, § 10, of the United States Constitution; and third, that the statute violates art. 7 of the Declaration of Rights by conferring special benefits on insured residents in certain cities and towns.

For the reasons discussed below, we conclude that c. 365 is "reasonable," since the Legislature could rationally have concluded that the competitive rate setting system under G. L. c. 175E had failed and had resulted in serious financial difficulties for many policyholders. Therefore, we hold that c. 365 is constitutional and order that a judgment to that effect be entered in the county court.

All parties agree that the purpose and effect of the challenged statute may best be viewed in the context of prior history of automobile insurance rate regulation in Massachusetts, and in light of the steps taken by insurance carriers to obtain approval of 1977 rates several months prior to the imposition of rebate requirements. We therefore summarize the pertinent facts.[1]

PRIOR HISTORY OF RATE REGULATION IN MASSACHUSETTS.

Until 1969, most automobile insurance rates were calculated and filed by insurers or rating bureaus and were allowed to go into effect immediately unless the Commissioner, after a hearing, disapproved. The Commissioner himself fixed rates only for certain basic compulsory and related coverages.

From 1969 to 1976, the Commissioner's authority to "fix and establish" rates for automobile insurance coverage was expanded, until by 1976 he set rates for nearly all types of

---

[1] Because of the mass of related circumstances, and the consequent necessity for selectivity, we recite, in substance, the facts which the plaintiffs chose to emphasize. However, we refer to some additional circumstances, submitted in the record, in our subsequent discussion.

automobile insurance coverage. In 1975, however, the Legislature decided on a very limited basis to permit companies again to file their own competitive rates for certain optional coverages, subject to stringent antitrust provisions and to the Commissioner's power to disapprove such rates after a hearing. These provisions were embodied in a new c. 175E, which was inserted in the General Laws, by St. 1975, c. 707, § 6.

In 1976 the Legislature totally eliminated the system of commissioner-fixed rates and made all automobile insurance coverages subject to c. 175E's competitive premium rating system.

The statute did not, however, eliminate the Commissioner's role in the ratemaking process. All rates were required to be filed forty-five days before their effective date for review by the Commissioner. G. L. c. 175E, § 7. Further, pursuant to the legislative mandate that the rates were not to be either "excessive or inadequate" or "unfairly discriminatory," G. L. c. 175E, § 4, the Commissioner was empowered to take the following actions.

First, the Commissioner could at any time suspend the operation of competitive rating for any territory or for any class of insurance if, after a hearing, he found competition to be either (i) insufficient to assure that rates would not be excessive, or (ii) so conducted as to be destructive of competition or detrimental to the solvency of insurers. St. 1976, c. 266, § 19, codified as G. L. c. 175E, § 5. In place of the defective rate, the Commissioner could fix and establish reasonable and nondiscriminatory premium charges using his traditional authority to do so under G. L. c. 175, § 113B, but without regard to the calendar dates in § 113B. St. 1976, c. 266, § 19, codified as G. L. c. 175E, § 5. Second, and also at any time during the rate period, the Commissioner could determine by hearing that a premium rate violated competitive standards or public policy, disapprove the rate, and order a curative premium adjustment. St. 1976, c. 266, § 19, codified as G. L. c. 175E, § 8.

The Commissioner undertook implementation of the competitive system pursuant to his statutory authority under c. 175E. During 1976, he drafted an entirely new policy form for all coverages. The Commissioner additionally established revised rating territories which were to be used by all companies as the basis for their computation of rates.[2] Further, the Commissioner promulgated regulations governing the form and content of filings, and prescribing a formula for the calculation of territorial "relativities."[3]

### RATE FILINGS FOR THE 1977 CALENDAR YEAR.

Rate filings were submitted to the State Rating Bureau in November, 1976, by twenty-two large companies or company groups and by the Massachusetts Automobile Rating and Accident Prevention Bureau (Bureau) on behalf of eighty-nine small companies. After reviewing each case, the State Rating Bureau challenged filings of the Bureau and of eight individual insurance companies. Rates for these companies were reduced accordingly. Subsequently, all rates, either as originally made or as reduced, were allowed by the Commissioner to go into effect.

The State Rating Bureau also received a filing from the Massachusetts Motor Vehicle Reinsurance Facility (Facility), an organization created by G. L. c. 175, § 113H, for

---

[2] The plaintiffs point out that, because of this change, it was clear that insureds in certain cities and towns would pay greater or smaller amounts in 1977 than they had in 1976, even if Statewide-average rates for each coverage remained unchanged. While a study by the Division of Insurance recognized this fact, and recognized that some such effects would be substantial, neither the study nor the Commissioner recommended any limitation on the rate effects of the new territorial system.

[3] The territorial relativities, or insurance rates applicable to each territory after multiplying the Statewide-average rate by a number greater or smaller than one, to reflect differences on claims experience, were to be calculated by a weighing of the filing company's own experience and industry-wide experience. For driver and vehicle relativities, companies were allowed to use either the relativities based on industry-wide experience or relativities derived from their own experience. In fact, all companies eventually chose the former option.

implementation of an assigned risk plan. The filing came under a new Facility Plan of Operation for 1977 (Plan), and proposed that (1) those insured under "company reinsured policies"[4] pay the voluntary market rates charged by their company; and that (2) those insured by the Facility under "servicing carrier policies"[5] pay rates at the 80th percentile of the voluntary market rates of all companies.

Under the 1977 Plan, the Facility Governing Committee authorized *any* broker or agent automatically to cede a policy to the Facility, to be carried by the Facility as a "servicing carrier policy." From experience under previous plans, the Commissioner assumed that within the competitive rating system, these "servicing carrier policies" written at 80th percentile rates would be used only as a market of last resort for undesirable new business. The effect of the 1977 Plan, however, was to increase greatly the number of servicing carrier policies, such that approximately 35% of the insurance market was placed in this category. The filing included no information concerning the number of insureds likely to fall into each of these two classes. The Commissioner permitted the Facility filing to become effective January 1, 1977.

The combined effect of the territorial reassignments made by the Commissioner, the territorial relativities applied by the companies, and broad expansion by the Facility of servicing carrier policies written at the 80th percentile, resulted in rates which, to many policyholders, were unexpectedly and unprecedentedly high. Therefore, the impact of the 1977 premium charges spurred a variety of remedial efforts. The Division of Insurance, for example, conducted investigations into Facility cession practices and into the extent of

---

[4] These are policies which are written by a company through its normal marketing process and at its usual rates, and, due to their risk factor, are reinsured by the Facility.

[5] Until 1977, these were policies issued only by brokers who could not obtain a voluntary agency contract with an insurance company, due to the risk factor involved in their business. Such policies were ceded to the Facility automatically.

competition in the insurance market. In April, 1977, the Governor and Commissioner proposed legislation imposing a 25% cap on all increases over 1976 rate levels. At the same time, the Governor asked companies to establish a voluntary cap. In July, 1977, the Legislature enacted the challenged statute.

1. The plaintiffs argue that c. 365 deprives them of property without due process of law and also impairs the obligation of the plaintiffs' contracts with their insureds by requiring them to refund part of the consideration for those contracts. Thus they say that c. 365 is invalid under the authority of controlling decisions of the United States Supreme Court and of this court. We do not agree.

We think it significant that the plaintiffs do *not* assert a claim of confiscation, nor do they argue that the rebates have lowered premiums unreasonably. Further, the plaintiffs challenge only the retroactive application of c. 365; there is no assertion as to illegality in so much of the statute as orders rebates prospectively for the remaining months of 1977 after the effective date of the statute.[6]

The plaintiffs contend that they have constitutionally protected property rights to the premiums charged for policies issued prior to the enactment of c. 365. They rely on arts. 1, 10, and 12 of the Declaration of Rights of the Massachusetts Constitution and on the Fourteenth Amendment to the United States Constitution, and they cite many cases of

---

[6] The Commissioner contends somewhat persuasively that the plaintiffs impliedly concede the power of the Legislature, as the ultimate authority over the regulation of the rates within constitutional limits, to adjust rates by statute from the effective date of the statute (in mid-1977) forward and despite the existence of contracts of insurance which cover the entire year. "Thus," says the Commissioner in his brief, "a lower premium cap, for the remaining months of 1977 — for example 20 percent rather than 25 — presumably would have been permissible, although the total revenues for the year might have been the same as under the objectionable c. 365. It is the form of the legislature's remedial response, not the substance or the result, which constitutes the fibre of the companies' complaint. However, their claim lies in equity, and is subject to the fundamental principle that 'in equity . . . the governing consideration must be substance . . . not form.'"

general applicability. See, e.g., *Regents of State Colleges* v. *Roth,* 408 U.S. 564, 577 (1972); *Haverhill Manor, Inc.* v. *Commissioner of Pub. Welfare,* 368 Mass. 15, 23, cert. denied, 423 U.S. 929 (1975). Under these provisions of the State and Federal Constitutions, say the plaintiffs, contractual rights plainly are constitutionally protected property rights (citing, e.g., *Boston Elevated Ry.* v. *Commonwealth,* 310 Mass. 528, 554-555 [1942]), and the retroactive aspect of c. 365 takes the plaintiffs' property unconstitutionally.

The plaintiffs also rely on many decisions of the United States Supreme Court, this court, and other courts, which specifically deal with instances of unconstitutional legislative interference with contractual obligations, including contracts of insurance. See, e.g., *Wasser* v. *Congregation Agudath Sholom,* 262 Mass. 235, 237 (1928); *Davenport Osteopathic Hosp. Ass'n* v. *Hospital Serv., Inc.,* 261 Iowa 247, 258-259 (1967). See generally *Manchester* v. *Popkin,* 237 Mass. 434, 439-440 (1921); *United States Trust Co.* v. *New Jersey,* 431 U.S. 1 (1977); *Home Bldg. & Loan Ass'n* v. *Blaisdell,* 290 U.S. 398 (1934). They emphasize the language in *United States Trust Co., supra* at 25-26, which states that laws impairing the obligation of private contracts may be constitutional if "reasonable" and "necessary" to serve an important public purpose. They contend that c. 365 is neither reasonable nor necessary.

The plaintiffs also argue in great detail, with exhaustive analysis of the factual circumstances and relevant statutes, that the premiums charged by the insurance companies in 1977 were not in any sense provisional or subject to later modification by either the parties or the Legislature. In the main, they dispute any contention that the Commissioner was surprised and shocked by the dollar figures which were charged to many policyholders, and they dispute the Commissioner's claim that G. L. c. 175E makes the 1977 rates provisional and thus subject to revision by c. 365. Moreover, they say that the Commissioner's argument that rates under c. 175E are provisional does not apply to Facility rates, which are filed under c. 175A, and they point out that rates

filed under c. 175A are clearly not subject to any subsequent modification.

We think the contentions of the plaintiffs are not persuasive. The language of many cases which they cite, concerning constitutional limitations of legislative powers as to retroactive legislation, is relevant, but only in a general way, since, as will be seen, *infra,* we examine the issues before us in the specific circumstances of *this* case.

Further, the plaintiffs miss the mark where they argue that the Commissioner made mistakes in his 1976 appraisal of the contemplated 1977 rate structure, or that the Commissioner now lacks credibility in his claim that dollar premiums shocked him when they were disclosed. They fail to recognize that it is the Legislature's action that is at issue here and that, within constitutional limits, the Legislature has ultimate authority as to premium rates. They miss the mark, also, when they argue, in substance, that the weight of circumstances was such that the Legislature should have resisted enacting c. 365 or should have enacted a different statute. We bring no such scrutiny to this case; it is not for us to comment on the wisdom of the legislation.

In one sense, however, the factors stressed by the plaintiffs are apposite and significant. The plaintiffs appropriately address the constitutional limitations of legislative power. The retroactive legislation, c. 365, as will be seen, *infra,* must meet the test of "reasonableness," and the elements detailed by the plaintiffs are pertinent to that test. However, we must examine the case, not to determine the weight of the evidence which might have been known to the Legislature as it enacted c. 365, but to determine whether the legislation was "reasonable" from any rational view the Legislature might have taken of the circumstances. We turn now to that question.

2. The United States Supreme Court and this court have held that retroactive statutes are not per se unconstitutional. *Massachusetts Port Auth.* v. *Treasurer & Receiver Gen.,* 352 Mass. 755, 762-763 (1967). *League* v. *Texas,* 184 U.S. 156, 161 (1902). Only those statutes which, on a balancing

of opposing considerations, are deemed to be unreasonable, are held to be unconstitutional. See *Opinion of the Justices*, 364 Mass. 847, 862 (1973); *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1, 14-20 (1976); *Fornaris* v. *Ridge Tool Co.*, 423 F.2d 563, 567 (1st Cir.), rev'd on other grounds, 400 U.S. 41 (1970).

Therefore, we apply the test of reasonableness to the retroactive aspect of c. 365. This test is determinative of all arguments of the plaintiffs, since we perceive no need for separate analysis of their various contentions under the impairment-of-contracts clause and under the due process clause of the United States Constitution and cognate State constitutional provisions. See, e.g., *Veix* v. *Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32 (1940); Hale, The Supreme Court and the Contract Clause: III, 57 Harv. L. Rev. 852, 872-892 (1944). In the context of this case, these various contentions "amount to much the same thing." See *Opinion of the Justices, supra* at 863.

Our analysis of "reasonableness" is guided in large part by several major considerations, as follows. The plaintiffs carry a heavy burden in seeking to overcome the statute's presumption of constitutionality. See *El Paso* v. *Simmons*, 379 U.S. 497, 508-509 (1965). "Every rational presumption is indulged in favor of the validity of an act of the General Court. Enforcement of such legislative enactment will not be refused unless its conflict with some provision of the Constitution is established beyond reasonable doubt." *Campbell* v. *Boston*, 290 Mass. 427, 429 (1935). This is particularly the case with economic and remedial social enactments. *Commonwealth* v. *Henry's Drywall Co.*, 366 Mass. 539, 542-544 (1974). In this sphere the burden is on the plaintiffs to make factual showings that the statute is irrational in its operation, and it has been our frequently stated rule that such a statute will not be set aside as a denial of due process "if any state of facts reasonably may be conceived to justify it." *Id.* at 542.

We recognize the validity of the plaintiffs' position that retroactivity in the legislation must be viewed with relation

to the police power of the State, for "it is basic that the State reserves police powers that may in a particular predicament enable it to alter or abrogate even conventional contractual rights." *Opinion of the Justices, supra* at 863. In our consideration of the relevance of the police power here it is appropriate that we should examine whether the Legislature could have regarded that the provisions of the statute dealt with matters of general regulation of the community in a manner closely related to its health, morals, safety, and fundamental welfare. See *Massachusetts Port Auth. v. Treasurer & Receiver Gen.*, 352 Mass. 755, 762 (1967). We think the Legislature could so regard the statute because of a number of factors which we discuss, *infra*, in our analysis of the "reasonableness" of the retroactive legislation. The essence of the Legislature's concern as to "public welfare" clearly was that very substantial and unexpected insurance premium increases affected large numbers of people.

It seems to us that our principal inquiry — as to reasonableness — is essentially a review of whether it is equitable to apply the retroactive statute against the plaintiffs. The equitable criteria as to reasonableness in this context have been established by the United States Supreme Court, this court, and other courts, as shown in our discussion, *infra*.

Reasonableness, in our view, can best be examined from three principal viewpoints: the nature of the public interest which motivated the Legislature to enact the retroactive statute; the nature of the rights (in this instance the plaintiffs' asserted rights) affected retroactively; and the extent or scope of the statutory effect or impact.[7]

---

[7] This three-pronged approach is suggested in the article by Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 697 (1960) (hereinafter cited as Hochman). This article is a comprehensive treatment of retroactive statutes and the "reasonableness" analysis, and has been cited with approval. See *Adams Nursing Home of Williamstown, Inc.* v. *Mathews*, 548 F.2d 1077, 1080 (1st Cir. 1977); *Fornaris* v. *Ridge Tool Co.*, 423 F.2d 563, 567 (1st Cir.), rev'd on other grounds, 400 U.S. 41 (1970).

### A. *The Nature of the Public Interest.*

As to the nature of the public interest which concerned and motivated the Legislature in enacting c. 365, we consider first that the Legislature could have concluded that there were urgent reasons, of emergency proportions, for immediate correction of the surprising and substantial impact of 1977 automobile insurance rates on large numbers of citizens of the Commonwealth. It could be concluded that urban motorists were hardest hit; in some cases premiums were doubled. Available to the Legislature, for example, was the report of three deputy insurance commissioners who in 1977 investigated the Facility experience: "Insurance companies did not deny that they have sent many good risks to the Facility. Their willingness to cast aside large blocks of potential customers without any supporting data casts doubt on the sincerity of their desires to function in a competitive environment. Their eagerness to apply generally higher Facility rates to existing customers with no notice or explanation suggests little interest in competition. None of the companies examined expressed any desire to capture a larger share of the market."[8]

The plaintiffs rely on *United States Trust Co.* v. *New Jersey,* 431 U.S. 1 (1977), and they quote, from that opinion at 25, the following: "As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is *reasonable* and *necessary* to serve an *important public purpose.*" (Emphasis added by the plaintiffs in their brief.) In this context, it is clear that the Legislature could have considered that the apparent failure of the competitive system, established for 1977 by prior legislation, had brought financial crisis to thousands of insureds. The Legislature could have considered, with its ultimate authority (within constitutional limits) as to rates, that prompt legis-

---

[8] The Commissioner correctly observes in his brief that it is not necessary that the truth of these conclusions be conceded by the plaintiffs at this time. The relevant consideration is that this is information which was available to, and could have been accepted by, the Legislature in considering the enactment of remedial legislation.

lative action was necessary, since speedy solutions could not be assured within the administrative process. These considerations lend support to the premise that the legislation, c. 365, was reasonable. That the Legislature might have, or arguably should have, come to different conclusions or followed a different course is not determinative.

The validity of the statute — and the conclusion as to its "reasonableness" — is also supported by the fact that it is designed to benefit the public directly, rather than reducing an obligation of the State. See *Opinion of the Justices*, 356 Mass. 775, 794 (1969); *Campbell* v. *Boston*, 290 Mass. 427, 430 (1935); *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 23-25 (1977); *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1, 14-20 (1976).

The need for retroactivity, and the reasonableness of the legislative response, become most apparent when the plaintiff claims a vested right arising out of the very transaction which motivated the Legislature to act. Hochman, *supra* note 2, at 701-702, and cases cited. The plaintiffs here claim vested rights under the same insurance contracts which, in many instances, gave rise to the rate levels which, in legislative judgment, necessitated a legislative remedy.

B. *The Nature of the Asserted Rights Affected.*

One of the plaintiffs' principal assertions is that the portions of the premiums applicable to the months of 1977 prior to the effective date of the statute had already been earned and thus were "vested" in the plaintiffs. We think this contention must be viewed in light of our recognition that automobile insurance has been intensively regulated for some years past, at least a decade. It has been an area of experiment, change, and reform.[9] No-fault insurance is but one phase of this cycle.

---

[9] See, e.g., St. 1970, c. 670, § 6; St. 1970, c. 744, § 2; St. 1971, c. 977, §§ 1 et seq.; St. 1972, c. 366; St. 1972, c. 423; St. 1972, c. 451; St. 1973, c. 338; St. 1973, c. 341, § 2; St. 1973, c. 599, § 1; St. 1973, c. 1113; St. 1974, c. 472, § 1; St. 1975, c. 707; St. 1976, c. 1, § 2; St. 1976, c. 266, §§ 12, 13, all affecting G. L. c. 175, § 113B, the basic statutory provision for automobile insurance rate setting. Examples of other statutes which

From all of this we recognize that an intensely regulated company is on some notice that future legislation may adjust its position. See *Attorney Gen.* v. *Commissioner of Ins.*, 370 Mass. 791, 826 n.43 (1976); *Veix* v. *Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 37 (1940). "Essentially, the question is . . . how great is the change viewed in the light of the reasonable expectations of the parties when the contract was entered into." *Fornaris* v. *Ridge Tool Co.*, 423 F.2d 563, 567 (1st Cir. 1970).

We recognize also that the concept of reasonableness is supported when retroactive legislation is enacted to cure a substantial defect which could not easily have been perceived at the time of the defective law's enactment. See *Danforth* v. *Groton Water Co.*, 178 Mass. 472, 477 (1901). The Legislature could reasonably conclude that the large premium increases were discoverable only after the bills were received by insureds during the early months of 1977; prior to that time nothing was filed or required to be filed with the Commissioner which reflected the relative increases in dollar premiums.

This factor in turn reflects on the premise that the insurers were on notice that their premiums received were not firm against legislative adjustment. The insurers were aware, or at least the Legislature could conclude so, that the great increases in premium rates could not have been predicted by the Commissioner or the Legislature, and this circumstance further casts doubt on the "fixed" or "vested" nature of the premiums as billed.

As important as any factor in appraising the reasonable expectations of the insurance companies is the existence of language which implied a power of retroactive adjustment in the Commissioner. The 1976 act (St. 1976, c. 266, § 19), which established the new system of competitive rate setting by insurers, provided for monitoring by the Commissioner

modify the operation of § 113B include St. 1976, c. 266, § 19, codified as G. L. c. 175E, §§ 1 et seq., and G. L. c. 90, § 34A, as amended (compulsory motor vehicle liability insurance).

in what is now G. L. c. 175E, § 5, and also for adjustment of a particular year's rate if the Commissioner determined during that year, inter alia, that competition was "insufficient to assure that rates will not be excessive." In so far as § 5 contemplates retroactive adjustment, it is similar to the legislative approach in previous years. See St. 1971, c. 977, § 1A (the "second look" statute); *Attorney Gen. v. Commissioner of Ins.*, 370 Mass. 791, 823-827 (1976). By G. L. c. 175E, § 8, inserted by St. 1976, c. 266, § 19, the Commissioner was also empowered to adjust premiums during the rate year if he determined, after a hearing, that, among other things, rates set by one or more insurers were "violative of public policy."

The plaintiffs' response to the Commissioner's argument concerning c. 175E, § 5, is that it should be construed as not conferring on the Commissioner any power to make retroactive adjustments of premiums and that, even if the section did have retroactive effect, a major portion of the retroactive adjustment brought about by c. 365 relates to the Facility, which is not governed by c. 175E, but by c. 175A. The deficit in the latter argument arises from the fact that the Legislature, before it enacted c. 365, had information, which it could have accepted as credible, that in 1977 the insurance companies had arbitrarily relegated a large number of insureds to the Facility. In these circumstances the plaintiffs' argument that § 5 was not significant in placing them on notice of the possibility of retroactive action is not persuasive.

C. *The Extent of the Abrogation of the Asserted Rights.*

Clearly, the enactment of c. 365 was written within the power of the Legislature as limited by the Federal and State Constitutions, and inferences as to the reasonableness of the legislation can be drawn from several factors. The retroactive statute is remedial rather than permissive. Compare *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 39 (1940), with *Opinion of the Justices*, 364 Mass. 847, 864 (1973), *Wasser v. Congregation Agudath Sholom*, 262 Mass. 235, 236-237 (1928), *Louisville Joint Stock Land Bank*

v. *Radford*, 295 U.S. 555 (1935), and *Sturges* v. *Crownin-shield*, 17 U.S. (4 Wheat.) 122, 198-202 (1819). It is a short-term response rather than a response of indefinite duration. See *Huard* v. *Forest St. Hous., Inc.*, 366 Mass. 203, 207 (1974). Moreover, the statute is narrowly drawn to treat the problem perceived by the Legislature. See *Springdale Convalescent Center* v. *Mathews*, 545 F.2d 943, 956 (5th Cir. 1977). Cf. *Huard* v. *Forest St. Hous., Inc.*, *supra* at 207-208. Thus, c. 365 is an emergency act, providing rebates only to those persons whose rate levels the Legislature determined were excessively high, and ending by its own terms at the close of 1977. St. 1977, c. 365, §§ 4-6.

3. Finally, we address the plaintiffs' argument that, in particular, two opinions of this court support the plaintiffs' position in this case.

First, the plaintiffs especially rely on some statements in the *Opinion of the Justices*, 334 Mass. 711 (1956). In that opinion the Justices advised that it would be unconstitutional for the Legislature to require by statute the refunding of a portion of 1956 compulsory insurance charges attributable to surcharges assessed under the Highway Safety Act. The statements of general principles by the Justices in that opinion hold true today, of course. The Commissioner correctly observes that where an advisory opinion has considered the identical issue later made the subject of a real court dispute, the court must in the adversary context "examine the question anew, unaffected by the advisory opinion." *Lincoln* v. *Secretary of the Commonwealth*, 326 Mass. 313, 314 (1950). This principle is particularly apt in the case before us, since the great differences between the statute in the case before us and the statute involved in the *Opinion of the Justices*, *supra*, and the differences in their contexts and circumstances, preclude the support the plaintiffs seek from that opinion.

The plaintiffs also rely especially on *Employers' Commercial Union Ins. Co.* v. *Commissioner of Ins.*, 362 Mass. 34 (1972). In that case this court placed emphasis on a provision in the insurance policies which provided for a retroac-

tive adjustment of premiums. Contrary to the plaintiffs' present arguments, we did not reach the issues central to the instant case, and indeed expressly disclaimed such considerations, as follows: "In view of what we have said above, we need not consider the further argument of the Commissioner that, even as to its effect upon 1971 insurance premiums, c. 977 is constitutional as a valid exercise of the police power of the Legislature, and more particularly the power of the Legislature to regulate insurance rates." *Id.* at 41.

4. The plaintiffs have specifically argued their assertion that the Chelsea-Revere rebate in particular is unconstitutional. They argue that special relief for those two communities is discriminatory, citing art. 7 of the Declaration of Rights of the Massachusetts Constitution, which closely parallels the Federal constitutional provision for equal protection of the laws. We reserve comment as to whether the plaintiffs have standing to raise this issue. There were known circumstances from which the Legislature could have concluded that policyholders in Chelsea and Revere were especially hard hit by extreme increases in premiums charged, and the Legislature could rationally determine that special relief was in order. That being so, the plaintiffs' argument that some other communities were just as seriously affected is not a ground for judicial relief.

5. All that we have said supports our conclusion that the Legislature, since it could have rationally determined that the establishment of rates by competition among the insurance companies had failed with serious financial results for many policyholders, enacted "reasonable" remedial legislation in the form of c. 365.

Judgment is to be entered in the county court declaring that c. 365 of the acts of 1977 is constitutional.

*So ordered.*