McHugh, J.
INTRODUCTION
Plaintiff in this case, the Federal Deposit Insurance Corporation (“FDIC”), seeks entry of judgment following two jury verdicts in its favor, one establishing the liability of defendant John H. Refalas and the other establishing that certain transfers from Mr. Refalas to his wife, Alice, were fraudulent. In addition, the FDIC seeks recovery of attorneys fees and costs claiming that the opposition of Mr. and Mrs. Refalas to its fraudulent-transfer claims was wholly insubstantial, frivolous and not advanced in good faith. See G.L.c. 231, §6F.
Defendants oppose the motion for entry of judgment. First of all, they seek to revisit allowance of the FDIC’s motion for summary judgment claiming that new evidence shows that the judgment should not have been granted. Next, they claim that the verdict establishing the fraudulent transfer simply requires Mrs. Refalas to return certain sums of money to Mr. Refalas but does not find Mrs. Refalas’s direct liability to the FDIC. Third, they contend that no interest is due on the amount the jury found to have been fraudulently transferred. Fourth, they contend that no attorneys fees should be awarded. Finally, they contend that their defense of “laches” requires a trial before any judgment enters.
At the hearing held on FDIC’s motion for entry of judgment, I stated that I would not reconsider my earlier allowance of the motions for summary judgment. [1] In the memorandum which follows, I shall deal with the other issues.
BACRGROUND
This case has had a tortuous history. Plaintiff filed the original complaint on October 23, 1991. In that complaint, plaintiff, as successor to Bank of New England, sought to recover the balance due on a $2 million loan the Bank of New England had made to Mr. Refalas as trustee of the John H. Refalas Realty Trust. Mr. Refalas personally guaranteed the note, which also was secured by a mortgage on some real estate. In addition to the claims against Mr. Refalas, plaintiffs complaint alleged fraudulent conveyance claims against others.[2]
The court ordered that the FDIC’s liability claims against Mr. Refalas be severed and tried before the fraudulent conveyance claims. That liability trial, following entry of summary judgment in plaintiffs favor on a number of issues, took place in June 1996, and resulted in the verdict in plaintiffs favor in the amount of $1,703,268.60.[3]
While the liability phase of the matter was proceeding, I stayed discovery with respect to the fraudulent transfer claims. I lifted that stay after the jury’s verdict and discovery began. Discovery produced evidence of transfers by Mr. Refalas to what the FDIC characterized as an essentially fictional corporation based in St. Lucia which then made transfers to an account at the Royal Bank of Canada in Montreal and then to Mrs. Refalas. Accordingly, the FDIC made various motions to amend the complaint and those motions were allowed.[4]
Ultimately, the fraudulent conveyance claims reduced themselves to claims that Mr. Refalas fraudulently transferred monies to Mrs. Refalas in violation of Sections 4 and 7 of the Uniform Fraudulent Conveyance Act, G.L.c. 109A, §§4, 7.[5] Those claims were tried to jury which, after due deliberation, concluded that Mr. Refalas had fraudulently transferred to Mrs. Refalas the sum of $367,983.71 in violation of §7 of the Act.[6] The jury returned a verdict in favor of Mrs. Refalas on the FDIC’s claims under §4 of the Act.[7] I thereafter ordered counsel for FDIC to submit, pursuant to Superior Court Rule 9A, FDIC’s proposed form of judgment. That submission and the opposition thereto form the basis for the present proceeding.
DISCUSSION
A. Nature of Mrs. Refalas’s Obligation
Against the foregoing backdrop, the FDIC, as stated, seeks entry of a judgment against Mrs. Refalas requiring her to pay the fraudulently-transferred sum directly to it. Mrs. Refalas contends that she should be required simply to return that sum to Mr. Refalas who then, presumably, would be required to pay it to the FDIC or to any other creditors who have priority over the FDIC’s claims.
G.L.c. 109A, §9 provides in material part as follows:
(1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser—
(a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
(b) Disregard the conveyance and attach or levy execution upon the property conveyed.
That section gives a creditor with a matured claim, like the FDIC has here, two options. The first option is to obtain a court order setting aside the conveyance to the extent necessary to satisfy the creditor’s claim. Such an order has the effect of returning to the debtor/transferor the fraudulently-conveyed property. Once the property is back in the hands of the debtor /transferor, the creditor then can take any steps the law allows to obtain that property.
*141 The second option is to disregard the conveyance and to attach or levy execution directly on the conveyed property. The second option manifestly was designed to deal with situations where the property in question could be specifically identified. It was not specifically designed to deal with fungible materials like cash.[8]
Nevertheless, in Joseph P. Manning Co. v. Shinopoulos, 317 Mass. 97, 99-100 (1944), the Supreme Judicial Court affirmed an order requiring entry of a money judgment in favor of the plaintiff creditor directly against the transferee. In so doing, the Court stated as follows:
The defendant has argued that the decree was improper in adjudging that he is indebted to the plaintiff in the amount stated because neither the allegations of the bill nor the findings of the trial judge state that he owed the plaintiff anything. We think, in the circumstances here disclosed, that the decree was not improper in that respect. The judge found that the defendant took possession of the mortgaged property and sold it for $700. Since the assignment, as stated above, was fraudulent as to the plaintiff, and [the transferee], who participated in the fraud, was not a “purchaser” “without knowledge,” the plaintiff is entitled under G.L. (Ter.Ed.) c. 109A, §9, to have the assignment “set aside . . . to the extent necessary to satisfy [its] claim.” The defendant has in his possession the proceeds of property fraudulently conveyed to him in an amount sufficient to satisfy the plaintiffs claim. The case at bar in this respect is governed by the recent case of Buckley v. John, 314 Mass. 719, which held that the grantee of a fraudulent conveyance who participated in the fraud can be required to pay the claim of a creditor of his grantor out of the property in his hands fraudulently acquired. It was said in that case, at page 727 of 314 Mass., “With the release out of the way, the judgment of Pandeli John against Demetri John is regarded in equity as still remaining in force for the purpose of satisfying the plaintiffs claim against Pandeli John, and can be reached and applied in a simple manner by requiring Demetri John to pay it to the plaintiff to the extent of the plaintiffs claim. It is not important in this case whether in theory this is deemed to be accomplished through the medium of G.L. (Ter.Ed.) c. 214, §3(7), relative to suits to reach and apply property which cannot be attached or taken on execution in an action at law ... or whether the uniform fraudulent conveyance law is so construed as in itself to authorize by implication the use of all equity powers necessary to the final satisfaction of the creditor’s claim ... In any event, the plaintiff is entitled to an effective remedy in equity.”
See also Citizens Bank of Massachusetts v. Callahan, 38 Mass.App.Ct. 702, 704 (1995).
In this case, the jury was instructed that, in order to return a verdict in the FDIC’s favor under §7, the FDIC had to persuade the jury that Mr. Refalas made the transfer with an actual intent to defraud the FDIC and that Mrs. Refalas either participated in or knew of Mr. Refalas’s fraudulent purpose when she received that transfer. In either case, Mrs. Refalas was a “participant” in Mr. Refalas’s fraud and the principles of the Shinopoulos case apply to her.[9]
It makes no difference that the jury was unpersuaded of the FDIC’s claim under §4. Defendants contend that the jury verdict in favor of Mrs. Refalas on that claim evinces the jury’s finding that Mrs. Refalas acted in good faith. Given the evidence in the case and the jury verdict on the claim under §7, however, the jury verdict on the claim under §4 is perfectly consistent with a belief that the loans and advances Mrs. Refalas made, although for value, were in fact part of an array of transactions designed to conceal, obfuscate and prevent discovery of the true nature of the payments Mr. Refalas, in an incredibly round-about fashion, was making to her.
The cases defendants cite are not to the contrary. To be sure, in Citizens Bank and Trust Co. v. Rockingham Trailer Sales, Inc., 351 Mass. 457, 462-63 (1966), a case on which they place heavy reliance, the Court did say that it was error for the trial court to have established liability to the plaintiff on the part of the transferee. The Court’s judgment in that regard, however, had to do with the form of the decree the trial court entered after finding a violation of §7. Indeed, even as reformed by the Supreme Judicial Court, the final decree ordered the transferee to pay the proceeds of the fraudulent transfer directly to the plaintiff and did not simply order repayment of the proceeds to the transferor.
B. Interest
The FDIC next contends that it is entitled to interest on the amount transferred to Mrs. Refalas from the time that it first made its claim regarding fraudulent transfers via the St. Lucia corporation. Those claims were filed on January 6, 1998, approximately one year before the FDIC filed an amendment making Mrs. Refalas a party to the case. Mrs. Refalas maintains that no interest of any kind is due and that the FDIC is simply entitled to recover the amount of money fraudulently transferred.
I am persuaded that, in this case, interest is recoverable under the principles set out in Fleet National Bank of Massachusetts v. Merriam, 45 Mass.App.Ct. 592, 595 (1988). The facts of that case, apart from the contempt decree, are similar to the facts of this case. Mr. Refalas put the FDIC through a “merry chase,” see id., indeed in order to find the monies it ultimately recovered in the most recent jury verdict. Mrs. Refalas took those monies knowing full well, at the least, of Mr. Refalas’s fraudulent purpose. She should have returned those monies promptly when the FDIC first *142 demanded that she do so. Her failure to return them entitles the FDIC to recover interest. Because there is no substantial evidence in the present record, however, that Mrs. Kefalas knew that the FDIC had made a demand for return of the money before she was actually served with the complaint naming her as a defendant, I conclude that interest should run only from the date she received service of the complaint.
C. Attorneys fees
1. Entitlement
The FDIC next contends that it is entitled to attorneys fees incurred in the fraudulent conveyance component of its action because the defendants’ defense to the fraudulent conveyance claim was of the type described in G.L.c. 231, §6F,[10] i.e., that the defense was “wholly insubstantial, frivolous and not advanced in good faith.”
Defendants, for their part, maintain that even their defense of the §7 claim did not meet the quoted criterion. Beyond that, however, they maintain that G.L.c. 231, §6F authorizes an award of attorneys fees only when “all or substantially all of the claims [or] defenses” the party asserted meet the quoted criterion. The jury verdict in Mrs. Kefalas’s favor on the §4 claim, they say, therefore immunizes them from liability for fees under §6F.
The evidence amply supported the jury’s verdict that Mr. Kefalas made the transfers in question fraudulently with an intent to hinder or defraud creditors. His concealing actions were no one-time affair but instead consisted of a persistent course of conduct carried out over an extended period of time, including creation of a corporation in St. Lucia through his brother-in-law that was designed solely to act as a conduit for monies he transferred and trips to and from his home in the Boston area to Montreal for the sole purpose of depositing and withdrawing monies in the Royal Bank of Canada for the purpose of concealing them from any creditor who might seek to find them.
The jury’s conclusion that Mrs. Kefalas either participated with Mr. Kefalas in that fraudulent scheme or knew of it at the time she received monies from Mr. Kefalas was likewise amply supported by the evidence. Indeed, her testimony about the basis of her financial transactions with her husband and her knowledge or lack of knowledge about his financial affairs was so transparently false that it virtually compelled disbelief.
Beyond that, Mr. Kefalas’s deposition testimony was repeatedly false on key issues and was designed to conceal for as long as he possibly could the existence of, and role played by, the St. Lucia corporation. Mr. and Mrs. Kefalas’s trial testimony about loans, accounting for loans and purposes for which loan proceeds were used was unsupported by anything save notes crudely scrawled in handwriting on various blank pieces of paper and was thoroughly incredible. The jury was right to reject it. In the last analysis, the defense Mr. and Mrs. Kefalas made to the FDIC’s claim under §7 was in fact insubstantial, frivolous and, above all, not advanced in good faith.
Under those circumstances, I am persuaded that an award of attorneys fees under G.L.c. 231, §6F is appropriate. I am unpersuaded that the verdict in favor of Mrs. Kefalas on the claim under §4 changes that result. Instead, I am persuaded that any transfers of money she made to Mr. Kefalas or any obligations she undertook for him were part of a scheme designed to create a bewildering series of transfers back and forth and in and out of various accounts so as to hide from outsiders the true origin of any funds the two of them were spending or receiving. Any consideration Mrs. Kefalas gave for money she received from Mr. Kefalas, therefore, was consideration given to further his fraudulent scheme. Although such consideration may amount to “value”, for purposes of defeating a claim under §4 of the Act, the existence of such consideration does not show that the Kefalas’s defense of their scheme was defense of legitimacy or anything remotely resembling legitimacy.
2. Amount
“A fair market rate for time reasonably spent preparing and litigating a case is the basic measure of a reasonable attorneys fee under State law as well as Federal law.” Fontaine v. Ebtec Corp., 415 Mass. 309, 326 (1993). In this case, counsel for the FDIC has submitted an affidavit detailing the legal services he and his firm performed and the hours they spent in performing those legal services. That affidavit reveals approximately 1285 hours of legal services for which counsel seeks compensation in the amount of $174,165.50. The average compensation thus sought approximates $136 per hour. On the basis of my review of the affidavit, my review of the bills submitted with the affidavit, my knowledge of legal fees charged in the Boston area during the relevant time, my knowledge of this case and its needs, my extensive participation in pretrial conferences and my observation of the trial, I am of the opinion that the hours spent were reasonable and the amount charged is reasonable. I see no reason to adjust the fee application either up or down.[11]
The FDIC also seeks costs in the amount of $28,078. Those costs, too, are detailed in the affidavit counsel submitted. Those costs are appropriate with the exception of the amount charged for online electronic research and for “courier fees.” The former is an element of overhead, not expense, and the latter often substitutes for regular mail even when time is not of the essence. Accordingly, I disallow those elements. Accordingly, I reduce plaintiffs claim for costs by 20% to $22,462.40 to account for those items.
D. Laches
When the fraudulent conveyance claims came on for trial, I ordered without objection that the issues involving the defense of laches be severed and, if .necessary, tried to me, sitting without a jury, after the jury had returned its verdict.[12] After the jury returned *143 its verdict, I issued a further order with respect to the parties’ presentation of the factual and legal issues they contended the defense of laches involved. Under that order, defendants were to serve on plaintiff their proposed findings of fact with respect to laches no later than October 27, 1999. Plaintiff was to designate those of defendants’ proposed findings with which it disagreed, make its own request for findings and serve the combined results on defendants no later than November 3, 1999. No later than November 8, 1999, defendants then were to serve their response to plaintiffs additional requests and file all of the requests and responses with the court.
The parties executed their responsibilities under the foregoing order and the resulting documents were filed with the court. I have reviewed those documents and, as a consequence of that review, have determined that the laches claim asserted by defendants has two primary components. First is defendants’ contention that plaintiff knew or should have known before this action began that it was not in possession of the original note or guarantee John Refalas signed and delivered to Bank of New England. Second is defendants’ contention that plaintiff knew for years before it added VI Caribbean Investments Inc. Ltd. (“VICI”) as a defendant in this action that the JRN Trust had assigned a certain mortgage to VICI[13] and that defendants were prejudiced by plaintiffs delay in adding VICI as a party.
Defendants’ contention with respect to plaintiffs knowledge that it did not have the original of the note or guarantee is not, in truth and fact, an assertion regarding laches at all. Instead it is yet one more effort to re-argue the motion for summary judgment I said I would not permit the parties to re-argue. I decline, therefore, to permit further pursuit of that component of the alleged laches claim.[14]
Insofar as defendants’ claims regarding the time when plaintiff knew about the assignment of the mortgage to VICI is concerned, defendants’ offer of proof contains a series of factual assertions which, if proven, would support their contention that an alert lender, or successor to a lender, in plaintiffs position would have been aware of VTCI’s existence long before the complaint was amended to include VICI as a party and to allege that VICI was a conduit through which Mr. Refalas made fraudulent transfers to Mrs. Refalas.
Laches, however, is an equitable defense available only to those who come to court with “clean hands,” i.e., available only to those who seek relief after acting in good faith. The doctrine is described in some detail in the following passage from the opinion of the Supreme Court of the United States in Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814-15 (1945):
The guiding doctrine in this case is the equitable maxim that “he who comes into equity must come with clean hands.” This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be “the abetter of iniquiiy.” . . . Thus while “equity does not demand that its suitors shall have led blameless lives,” ... as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue . . .
This maxim necessarily gives wide range to the equity court’s use of discretion in refusing to aid the unclean litigant. It is “not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.”... Accordingly one’s misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.
Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance.
Those principles are a firm and fundamental part of the law of Massachusetts. See, e.g., Fidelity Management & Research Co. v. Ostrander, 40 Mass.App.Ct. 195, 200 (1996).
Here, as I already have stated, the defendants’ conduct was not simply inequitable. John Refalas engaged in fraud and, at the very least, Alice acted in concert with him with knowledge of his fraud. It would be wholly inappropriate for a court of equity to assist either of them to take advantage of their own misconduct and in the process to secure for themselves the fruits of what they wrongfully sought to conceal from the FDIC. Accordingly, even if the FDIC delayed longer than it should have in naming VICI as a party and even if that delay caused some prejudice to the defendants and even if the defense of laches were otherwise available in an action brought by the FDIC to enforce the note and guarantee, I am of the opinion that defendants should not be permitted to assert that defense here. I therefore decline to permit them to do so.[15]
ORDER
In light of the foregoing, judgment will enter
*144 1. On Count 1 of the Sixth Amended Complaint in favor of FDIC against defendant John H. Refalas Realty Trust in the amount of $1,703,268.60 plus interest at the rate of 12% from June 28, 1996;
2. On Count 2 of the Sixth Amended Complaint in favor of FDIC against defendant John H. Refalas in the amount of $1,703,268.60 plus interest at the rate of 12% from June 28, 1996;
3. On Count 7 of the Sixth Amended Complaint in favor of FDIC against defendant Alice Refalas in the amount of $367,983.71 plus interest at the rate of 12% from the date service of a Complaint in this action was first made on her;
4. On Count 7 of the Sixth Amended Complaint in favor of FDIC against defendants John H. and Alice Refalas, jointly and severally, in the additional amount of $174,165 for attorneys fees plus $22,462.40 for costs, all without interest; and
5. Dismissing Counts 3, 4, 5, 6 and 8 of the Sixth Amended Complaint.

Defendants seek reconsideration on grounds that the “new evidence” reveals that the FDIC never possessed the original of the note upon which it has brought suit. There is no question about the assignment of rights from FDIC’s predecessor, Bank of New England, to FDIC. Defendant Refalas admitted in his answer that the copy of the note attached to the complaint was true and accurate as was the copy of his guaranty. Refalas Answer §§19, 20. Whether the original was or was not in FDIC’s possession makes no material difference to anything. If defendants believe they are subject to the possibility of suit by another holder of the note, there are ways to deal with that issue. They, however, have proposed none.

In one way or another, those fraudulent conveyance claims were winnowed out, leaving for resolution only those against Mrs. Refalas.

The jury reached that verdict by determining that the FDIC was entitled to $641,847.22 in interest over and above the $1,045,000 unpaid principal balance of the note and that the FDIC was entitled to an additional $31,532.66 as reimbursement for various costs the FDIC had incurred. The jury also found that Mr. Refalas was entitled to an offset against that sum totaling $ 15,111.33.

The precise origin of the transferred funds, the mechanism by which they were allegedly transferred and details concerning the corporation are irrelevant to the present discussion and thus are not set forth in full here.

These transfers were made before the amendments to the Uniform Fraudulent Conveyance Act contained in St. 1996, §157 became effective. It is not clear that the law requires application of the unamended statute to this case. See generally American Mfrs. Mut. Ins. Co. v. Commissioner of Ins., 374 Mass. 181, 190-191 (1978); Parello v. McKinney, 46 Mass.App.Ct. 785, 790-92 (1999). Nevertheless, the parties have agreed that the terms of the earlier statute apply and I shall apply them. Accordingly, all references to the Act which follow are references to the act as it existed before the amendments.

That section provides:
Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Section 4 provides:
Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Sections 8 and 9 of the Act, as amended by St. 1996, c. 157, have addressed that problem as well as a number of others the former Act produced during the years it was in existence and now expressly provide that judgment may be rendered against the transferee in an appropriate case.

Defendants contend that the jury verdict against Mrs. Refalas on the §7 claim somehow was the product of an inference the jury drew solely from the fact of the husband-wife relationship between Mr. and Mrs. Refalas. Basing a verdict on that inference alone, however, would have run counter to the instructions I gave the jury and the jury is presumed to have followed the court's instructions. See Commonwealth v. Kilburn, 426 Mass. 31, 37-38 (1997); Commonwealth v. Watkins, 425 Mass. 830, 840-41 (1997); Commonwealth v. Cameron, 385 Mass. 660, 668 (1982). Moreover, that approach to the basis for the jury verdict overlooks the substantial evidence introduced during the course of the trial that the jury could have used to conclude that Mrs. Refalas knew full well what Mr. Refalas was up to and when he was up to it.

Insofar as Mr. Refalas is concerned, the FDIC also contends that the guarantee he signed provides for appropriate attorneys fees. Those fees, however, if due at all, are due pursuant to a contractual relationship between the FDIC's predecessor and Mr. Refalas. Accordingly, evidence of those fees must be presented to the trier of fact and they cannot be assessed by the court following the jury’s verdict. See First National Bank of Boston v. Brink, 372 Mass. 257, 264 (1977). Likewise, the court in Fleet National Bank of Massachusetts v. Merriam, 45 Mass.App.Ct. 592, 596 (1998), concluded that attorneys fees were an element of damages properly assessed in a case involving a violation of §7. But those damages, like all others, are something the FDIC would have had to prove to a trier of fact. See Franchi v. Stella, 42 Mass.App.Ct. 251, 259 (1997). It did not attempt to do so.

 At one pretrial conference, I remarked that both the plaintiff and defendants, in my view, were conducting themselves in an unnecessarily contentious manner. That was an accurate statement of my view at the time. The trial, however, revealed the complexity of the scheme Mr. and Mrs. Refalas created in far greater detail than had been revealed in any pretrial proceedings. I now am of the opinion that unraveling that scheme required the degree of intensity and accompanying contentiousness counsel for FDIC displayed.

Laches, of course, is an equitable defense as to which there is no right to trial by jury.

Plaintiff alleges that John Refalas fraudulently conveyed the proceeds of that mortgage to his wife, Alice, via VICI.

That is not to say that there is any suggestion in the papers the parties recently filed that that component of the laches claim has any merit. See n.1, supra.

FDIC also argues that the defense of laches is unavailable when a public agency brings suit to enforce federal or state law. For that proposition FDIC cites FDIC v. Gladstone, 44 F.Sup.2d 81, 90 (D.Mass 1999). Accord Board of Health of Holbrook v. Nelson, 351 Mass. 17, 19 (1966). Those cases involved a public agency’s effort to remedy an individual's alleged violation of a federal or state law. I am not persuaded that the defense of laches is unavailable in cases like this one which simply involve a public agency's collection of a debt arising out of a purely private transaction.