BORDEN, INC. vs. COMMISSIONER OF PUBLIC HEALTH.
(and four consolidated cases[1]).

Suffolk. November 1, 1982. — April 12, 1983.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Public Health. Hazardous Substance. Regulation. State Administrative Procedure Act. Administrative Law,* Adjudicatory proceeding, Regulations, Administrative Procedure Act, Agency, Rule making, Judicial review.

When the Commissioner of Public Health, on the basis of his determination that urea formaldehyde foamed-in-place insulation and the chemical formaldehyde are hazardous substances, adopted regulations pursuant to G. L. c. 94B, §§ 1, 2, and 8, banning the sale, distribution, and all uses of urea formaldehyde foamed-in-place insulation and requiring suppliers of such insulation, on request, to remove it from buildings in which it had been installed and to refund the purchase price, he was not required to hold an adjudicatory hearing, either by reason of language in G. L. c. 94B, § 2, requiring conformity to Federal regulations [715-716], or by reason of any provision in the State Administrative Procedure Act [716-717].

Where the Commissioner of Public Health adopted regulations pursuant to G. L. c. 94B, §§ 1, 2, and 8, requiring suppliers of urea formaldehyde foamed-in-place insulation to remove such insulation from buildings in which it had been installed and to refund the purchase price, the Commissioner was required, by G. L. c. 30A, the State Administrative Procedure Act, as well as by due process principles, to provide an adjudicatory hearing procedure to determine whether a named supplier had furnished particular insulation with respect to which removal and repurchase were sought. [717-720]

Discussion of the principles of law governing judicial review of regulations adopted by governmental agencies. [720-724]

In an action by manufacturers and distributors of urea formaldehyde foamed-in-place insulation seeking a declaration that regulations adopted by the Commissioner of Public Health pursuant to G. L.

[1] Aerolite SPE Corporation & others vs. Commissioner of Public Health. The Formaldehyde Institute & others vs. Commissioner of Public Health. Anderson Foam Distributors & others vs. Commissioner of Public Health. The Berkshire Gas Company vs. Commissioner of Public Health.

c. 94B, §§ 1, 2, and 8, banning the sale, distribution, and all uses of such insulation were invalid, the plaintiffs failed to prove that the Commissioner lacked any conceivable rational basis for the regulations. [724-729]

Suppliers of a type of building insulation which was later identified in regulations of the Commissioner of Public Health as a banned hazardous substance had an absolute obligation under G. L. c. 94B, § 8, to repurchase the product under regulations adopted by the Commissioner, and were not entitled to show, in the case of individual installations, that the insulation had not had harmful effects. [729-731]

General Laws c. 94B, § 8, permits the Commissioner of Public Health to require by regulation that a product banned as a hazardous substance be repurchased by any supplier in the chain of supply, with the purpose that the final obligation falls on the manufacturer or importer who introduced the product. [731]

Regulations of the Commissioner of Public Health respecting the removal and repurchase of urea formaldehyde foamed-in-place building insulation, which the Commissioner determined to be a hazardous substance, appropriately provided for removal costs to be passed along the chain of supply to the manufacturer of the product. [732]

The evidence in an action challenging the validity of regulations of the Commissioner of Public Health banning, as a hazardous substance, urea formaldehyde foamed-in-place building insulation revealed a rational basis for the Commissioner's conclusion that the product tripolymer falls within the generic category of formaldehyde insulation products and poses a health hazard through release of formaldehyde into the air. [732-734]

Procedures by which the Commissioner of Public Health adopted regulations banning urea formaldehyde foamed-in-place building insulation as a hazardous substance did not support the contention that the Commissioner had prejudged the issues respecting this product. [734-736]

In an action challenging the validity of regulations of the Commissioner of Public Health banning urea formaldehyde building insulation as a hazardous substance, the judge should have admitted the Commissioner's proffered evidence respecting the product's carcinogenicity, as tending to show a rational basis for the regulations, notwithstanding the Commissioner's statement that, in deciding to ban the product, he did not rely on evidence of its carcinogenicity. [736-737]

Regulations of the Commissioner of Public Health requiring repurchase of a product determined by him to be a hazardous substance violated neither the due process clause nor the contract clause of the United States Constitution [737-738], nor did the absence from the regulations of a chemical definition of the product render them unconstitutionally vague [738].

CIVIL ACTIONS commenced in the Superior Court Department, two on November 16, 1979, and one each on May 9, 1980, February 9, 1981, and July 31, 1981.

The cases were heard by *Ronan, J.*

The Supreme Judicial Court granted requests for direct appellate review.

*Stephen S. Ostrach,* Assistant Attorney General (*Gerald J. Caruso,* Assistant Attorney General, with him) for Commissioner of Public Health.

*John J. Curtin, Jr.* (*Michael W. Davis,* of Illinois, with him) for Borden, Inc.

*Joseph L. Kociubes* (*Alexandra Leake* with him) for The Formaldehyde Institute.

*Michael S. Marcus,* of the District of Columbia, for C.P. Chemical Company, Inc.

*Wendell J. Leary* for The Berkshire Gas Company.

NOLAN, J.   These appeals raise numerous procedural and substantive facial challenges to regulations issued by the Commissioner of the Department of Public Health (commissioner), banning the sale, distribution, and all uses of urea-formaldehyde foamed-in-place insulation (UFFI) in the Commonwealth (ban regulations), and requiring the manufacturers, dealers, and installers of UFFI to remove it from any building where it was installed, restore the house, and refund the purchase price (repurchase regulations). The commissioner's regulations were based on his findings that formaldehyde and UFFI were toxic, irritant, hazardous substances and that the potential for release of formaldehyde from UFFI into the indoor environments of buildings in which it is used as insulation justified its ban. In promulgating these regulations, the commissioner purported to act under the authority granted him by G. L. c. 94B. After trial, a judge of the Superior Court invalidated the regulations in their entirety.   The two main challenges concern whether the commissioner was required to hold adjudicatory hearings prior to issuing the regulations and whether the regulations are illegal, arbitrary, or capricious. We reverse the judgments of the Superior Court and uphold

the commissioner's regulations with the exception detailed below. Other issues raised on this appeal will be set forth as they are treated in this opinion.

1. *General background.* The trial judge made the following findings. Formaldehyde is a colorless, gaseous compound of carbon, hydrogen, and oxygen. It is present, with other aldehydes, in the atmosphere, where it is continuously introduced through natural processes of photochemical generation in plants. Automobiles also inject formaldehyde into the atmosphere as a by-product of the incomplete burning of hydrocarbon fuels. It is produced by emissions from industrial and power plants, by smoking, by the use of gas stoves, and even by the heating of cooking oils. Formaldehyde is found in fruits and vegetables such as apples and potatoes. Formaldehyde is also found in mammals; it is produced in the human system during metabolism but it does not accumulate. It is probable that ambient levels of formaldehyde are greater in urban than in rural environments.

Formaldehyde is the most commercially significant form of the aldehydes. About half of the eight billion pounds produced annually in this country is used in the preparation of urea-formaldehyde and phenol formaldehyde resins. These resins are useful for their bonding properties, and they are used in the production of plywood, particle board, and a wide variety of molded or extruded plastic items. Another twenty-five percent of the formaldehyde produced is used in disinfectants, textile treatment agents, leather processing, and dye manufacture. Formaldehyde is also a constituent of fertilizers, fungicides, clothing, cleansers, waterproofing, fur, wood and leather preservers, lacquers, varnishes, paper, film, glues, drugs, cosmetics, and deodorants.

The use of UFFI as an insulation material began in Europe in 1958. While it was used extensively in northern Europe in the 1960's, its use did not develop in this country until after the Arab oil embargo in 1974. It was marketed with increasing success until 1978 when there was a signifi-

cant decrease in sales. Some 400,000 houses in the United States have been insulated with UFFI. Approximately 1,260 houses in Massachusetts have been insulated with Insulspray, a trade name for one of the UFFI products here at issue, and some 860 with Tripolymer, a trade name for another product involved here. The number of houses in Massachusetts insulated with other UFFI products is unknown.

The advantages of UFFI are that it is efficient, easy to handle and transport, and relatively inexpensive. The average cost of insulating a seven-room house with UFFI ranges from $1,200 to $1,400. UFFI is comprised of three main ingredients: a polymerized urea-formaldehyde resin, a foaming agent called a surfactant, and air. These ingredients are mixed at the job site using portable equipment. The foaming agent is pumped into a mixing or foaming gun where it is mixed with air to form small bubbles. These bubbles are then coated with the resin which enters the gun through a separate line. The coated bubbles are then forced through the gun into wall cavities through small holes cut into the wall for that purpose. At first, the coated bubbles have the appearance and consistency of shaving cream, but the foam soon begins to harden or cure until it becomes firm and self supporting. Subject to conditions of temperature and humidity, the curing process is usually complete in a few days. The quality of the over-all product depends on the quality of the ingredients, the correctness of the mixture, the age and viscosity of the resin, and the temperature at which the foaming occurs.

The disadvantage of UFFI is that it releases, or "off-gases," formaldehyde vapor. The quality, mixture, age, handling, temperature and method of installation of the product, as well as the use of vapor barriers and the physical characteristics of the house, are all factors contributing to the amount of formaldehyde that will be released, or off-gassed, into the house or outside environment. Although the trial judge did not find, he noted there was evidence before the commissioner to suggest that even properly installed UFFI is likely

to emit formaldehyde. The potential danger of this formaldehyde "off-gassing" is a subject of much scientific debate and is at the heart of the present controversy.

2. *The prior administrative and judicial proceedings.* The Department of Public Health (department) began investigating the release of formaldehyde from UFFI in the summer of 1978. On February 22, 1979, the commissioner announced that the department would hold hearings in late March on a proposed ban of UFFI. Prior to the hearings, a number of the present plaintiffs objected to the procedure outlined in the commissioner's notice, and requested an adjudicatory hearing, or, in the alternative, certain other procedural safeguards. These requests were denied. Hearings were held on March 29 and 30, 1979. On November 1, 1979, the commissioner, acting under the authority of G. L. c. 94B, §§ 1, 2 & 8, issued regulations effective November 14, 1979, which declared formaldehyde and UFFI to be toxic and hazardous substances, banned the sale of UFFI, and required its repurchase in certain circumstances. 105 Code Mass. Regs. 650.000-650.990 (1979). The commissioner also released a detailed summary of the evidence and findings and conclusions concerning formaldehyde and UFFI (commissioner's findings). On November 16, Aerolite SPE Corporation (Aerolite), C.P. Chemical Company, Inc. (C.P. Chemical), Borden, Inc. (Borden), and others commenced actions in the Superior Court in Suffolk County against the commissioner challenging the ban and repurchase regulations. The commissioner and some of the parties thereafter entered into a stipulation whereby the commissioner agreed to stay the effective date of the repurchase regulations while the industry agreed to forgo seeking a preliminary injunction against the ban regulations. On May 9, 1980, The Formaldehyde Institute (Institute) and others commenced an action. The commissioner had scheduled further hearings to consider the repurchase regulations. The hearings were held on December 19, 1979, and on August 1, 1980. Motions by the parties for adjudicatory hearings or other procedural devices were again denied. On

November 6, 1980, the commissioner issued revised repurchase regulations. 105 Code Mass. Regs. 650.220(3) and 650.222 (1980). These regulations, effective November 20, 1980, created a procedure for repurchase commencing when the owner of a building allegedly insulated with UFFI requested repurchase. The class of persons entitled to request repurchase was more limited than the class created in the original repurchase regulations, and an informal referee review process was established to determine, at the request of the affected industry member, whether the person requesting repurchase met the regulatory criteria.

Following issuance of these regulations, the plaintiffs in the actions by Borden and the Institute amended their complaints to challenge the revised repurchase regulations. Anderson Foam Distributors (Anderson) and a number of UFFI installers joined in a new action to challenge only the repurchase regulations. Only one of the plaintiffs in the Aerolite action, C.P. Chemical, renewed its claim against the repurchase regulations with an amended complaint.

The parties in the Borden action jointly moved that the case be specially assigned to a judge of the Superior Court to hear and decide all issues. The motion was allowed and on the commissioner's motion the case was consolidated with the three other cases challenging the regulations.

On July 31, 1981, The Berkshire Gas Company (Berkshire) commenced an action challenging the revised repurchase regulations and claiming as well that its involvement with UFFI did not fall within the reach of the regulations. This case was consolidated with the other four.[2]

---

[2] It is apparent that Berkshire did not manufacture or install UFFI. However, the trial judge found that it promoted the use of UFFI for its residential customers beginning in 1975. Initially, Berkshire referred customers to a specific private installer and received a referral fee. Approximately 122 houses were insulated under this arrangement. In late 1976 or early 1977, Berkshire ended the referral arrangement and began to negotiate and contract directly with its customers for installation. Berkshire then subcontracted installation work to a private installer for a portion of the contract price with the customer, which was paid to Berkshire. Approximately 160 houses were insulated this way. About

The consolidated cases were heard over nineteen trial days in September and October, 1981. During trial, the judge excluded evidence offered by the commissioner concerning the potential carcinogenicity of formaldehyde.[3]

On January 18, 1982, the judge issued his findings, rulings and order (judge's findings), and, on January 29, 1982, he entered judgment invalidating the challenged regulations in their entirety. Relevant portions of the judge's findings are discussed below. The judge denied the commissioner's motion to stay the judgment against the ban regulations, but he granted a temporary stay to allow the commissioner to seek a stay pending appeal. The commissioner appealed from the judgment to the Appeals Court on February 3, 1982. The Appeals Court continued the stay as to the ban regulations until further order. That stay is presently in effect due to the collective suggestion filed in the Appeals Court by all parties, and treated by that court as a stipulation. This court subse-

---

June, 1977, Berkshire terminated its arrangement with this subcontractor. It then began to purchase quantities of UFFI ingredients from Celsius Resources, Inc., and it maintained a supply of UFFI in its warehouse. Berkshire continued to promote use of UFFI among its customers and to negotiate and contract directly with them. Berkshire would subcontract the actual installation with an installer approved by Celsius, and the installer would use Berkshire's supply of UFFI ingredients. Another 160 or so houses were insulated under this arrangement. Berkshire ceased contracting for installation of UFFI after March, 1979.

Berkshire asserts in its brief that it did not distribute, manufacture, or install UFFI but that it is nevertheless subject to the repurchase regulations. Although the judge made the above findings relative to Berkshire's promotional and contractual involvement with UFFI installation, he did not rule whether this activity fell within the ambit of the repurchase regulations. Because Berkshire does not argue here that it should not be subject to the repurchase regulations, we deem the issue waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). The commissioner does not challenge Berkshire's standing; therefore, we assume, without deciding, that Berkshire has standing to assert this appeal.

[3] The commissioner had stated in his findings that he did not rely on evidence of carcinogenicity in finding that UFFI was a hazardous substance but he had noted that carcinogenic evidence "provides an additional reason why formaldehyde and UFFI are toxic and hazardous and buttresses the findings concerning the danger posed by formaldehyde and UFFI."

quently allowed separate applications for direct appellate review. We reverse the judgments of the Superior Court.

3. *Right to an adjudicatory hearing.* The plaintiffs contend that, as to the commissioner's decisions to ban UFFI and to compel the product's repurchase from consumers, they were entitled to an adjudicatory proceeding under the State Administrative Procedure Act (G. L. c. 30A), the Federal Hazardous Substances Act (15 U.S.C. §§ 1261-1274 [1976]), and the Federal and State Constitutions. See G. L. c. 30A, § 1 (1) (definition of adjudicatory proceeding). The trial judge so held. We disagree.

First, the plaintiffs argue that G. L. c. 94B required an adjudicatory hearing. They contend that as c. 94B, § 2, required the commissioner to promulgate regulations in conformity, in so far as practicable, with regulations established pursuant to the Federal Hazardous Substances Act, and as that Act arguably requires an adjudicatory hearing prior to the banning of a product, G. L. c. 94B likewise requires an adjudicatory hearing. We disagree.

General Laws c. 94B, § 2, as appearing in St. 1972, c. 506, § 1, provides in relevant part, "The commissioner shall cause the regulations promulgated under this chapter to conform, insofar as practicable, with the regulations established pursuant to the Federal Hazardous Substances Act." The statutory language does not require conformity with Federal administrative procedure. We decline to read such a requirement into the plain language of G. L. c. 94B, § 2. We read the statutory language quoted above as ensuring that the Commonwealth's regulation of a particular substance be harmonious with any Federal regulation of the same product. In light of the State law of administrative procedure embodied in G. L. c. 30A, we do not read the above quoted language as reflecting a legislative intent to incorporate the Federal law of administrative procedure into the State regulation of hazardous substances.

The plaintiffs also argue that G. L. c. 30A required the commissioner to hold an adjudicatory hearing. They argue that the proceeding before the commissioner was a proceed-

ing against a specific res, UFFI, and conclude that where that res had an obvious spokesman (The National Association of Urea-Formaldehyde Insulation Manufacturers, [NAUFIM]), such a proceeding should be conducted in accordance with the procedures governing adjudicatory proceedings. We disagree.

An administrative agency may act either by adjudications or by rule making. "[T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *Arthurs* v. *Board of Registration in Medicine*, 383 Mass. 299, 313 (1981), quoting *SEC* v. *Chenery Corp.*, 332 U.S. 194, 203 (1947). General Laws c. 30A, § 1 (1), as amended by St. 1966, c. 497, defines an adjudicatory proceeding as "a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing." As we said in *Labor Relations Comm'n* v. *Fall River Educators' Ass'n*, 382 Mass. 465, 470 (1981), "An adjudicatory proceeding is one in which a statutory or constitutional direction dictates an agency hearing." On the other hand, a regulation is defined as "the whole or any part of every rule, regulation, standard or other requirement of general application and future effect . . . adopted by an agency to implement . . . the law enforced or administered by it . . . ." G. L. c. 30A, § 1 (5), as amended through St. 1974, c. 361, § 1. The conceptual borders dividing adjudication and regulation have not yet been clearly drawn, and such a clear division may well be impossible of achievement.

However, a three-pronged analysis is appropriate in these cases. First, are the "legal rights, duties or privileges of specifically named persons" at issue? If so, does any provision of the General Laws require that such rights, duties, or privileges be determined after an agency hearing? If not, does any constitutional provision require that such rights, duties, or privileges be determined after an agency hearing? G. L. c. 30A, § 1 (1).

Resolution of the first question is dispositive of the issue with respect to the ban regulations. There are no "specifically named persons" whose rights, duties or privileges are being determined. In pursuit of the goal of protecting the public health and safety, the commissioner declared UFFI to be a banned hazardous substance and ordered its removal from commerce. G. L. c. 94B, § 2 (d). He did not purport to determine the legal rights, duties, or privileges of any named persons.[4] As such, the proceeding was not an adjudicatory proceeding within the meaning of G. L. c. 30A, § 1 (1).

However, as to the regulation ordering the repurchase of UFFI,[5] a hearing is required by the Federal and State Constitutions in those circumstances in which a consumer asks the commissioner to require a certain named supplier[6] to repurchase identified UFFI from such consumer. This type of proceeding will be one in which the legal rights and duties of specifically named persons are required by the Federal and State Constitutions to be resolved through an adversary procedure. Therefore, under the State Administrative Procedure Act and concepts of procedural due process, the commissioner must conduct an adjudicatory proceeding to determine whether a named supplier furnished the UFFI in question, and is, therefore, subject to an order compelling its repurchase.

The commissioner's repurchase regulations provide that, at the request of the supplier, the consumer and the supplier of the UFFI may submit written materials to the department. 105 Code Mass. Regs. 650.222 (E) (1)-(6) (1980).

---

[4] We do not view NAUFIM, the urea-formaldehyde trade association, as being a "specifically named person" whose interests were at issue.

[5] Such a result is compelled by an analysis of the same factors explained above.

[6] For the sake of clarity, we shall use this term to include, where appropriate, the manufacturers, installers, dealers, and other distributors of UFFI who fall within the commissioner's regulations. We shall use the term "supply" to include, where appropriate, manufacture, install, deal, and distribute.

These materials will be forwarded to a medical referee and to a legal referee selected by the commissioner. *Id.* 650.222 (E) (7). The medical referee shall review the material and shall determine whether the consumer suffered adverse health symptoms after or during exposure to UFFI and whether such symptoms are characteristic of formaldehyde exposure. *Id.* 650.222 (E) (9) (a). Likewise, the legal referee shall review the materials and shall determine the following issues: whether the consumer owned a UFFI insulated building, *id.* 650.222 (E) (9) (b) (1); whether the UFFI was installed in the building, *id.* 650.222 (E) (9) (b) (2); whether the request for repurchase was timely filed, *id.* 650.222 (E) (9) (b) (3); whether the person adversely affected by the UFFI is an occupant or former occupant of the UFFI insulated building, *id.* 650.222 (E) (9) (b) (4); and whether the named supplier furnished the UFFI of which repurchase is requested, *id.* 650.222 (E) (9) (b) (5). These findings shall be made "unless the [referees conclude] that the record clearly and convincingly demonstrates that [the findings] are untrue." *Id.* 650.222 (E) (9) (a) & (b). Once these findings have been made, the commissioner shall issue a "Certificate of Right to Repurchase" entitling the consumer to a repurchase of the UFFI. *Id.* 650.222 (E) (9) (c) & (F) (1).

We conclude that insofar as the regulations do not require the legal referee to conduct an adjudicatory hearing with respect to the issue of whether the named supplier in fact supplied the UFFI of which repurchase is sought, such regulations are deficient because in such a circumstance the rights, duties, and privileges of a "specifically named" person are required by due process principles to be determined after a trial-type hearing. *Id.* 650.222 (E) (9) (b) (5). This factual issue is not a political question, but, rather, an adjudicative question which depends, for its resolution, upon the examination of specific facts relating to a particular supplier and consumer. Under these circumstances, procedural due process based on ordinary principles of fairness requires the agency to conduct an adjudicatory hearing on such issue. *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491, 499 (1965). With the qualification that an

adjudicatory hearing is required to determine the factual issue as to who supplied the particular UFFI in question, we hold that the repurchase regulations are, with respect to the right to an adjudicatory hearing, constitutional and consistent with G. L. c. 30A, § 1 (1).

The reason that an adjudicatory hearing is required only with respect to the issue of what supplier furnished the UFFI of which repurchase is sought is based on a proper interpretation of G. L. c. 94B, § 8. Once a product is banned under c. 94B, § 2, such product *"shall,* in accordance with regulations of the commissioner, be repurchased . . . ." G. L. c. 94B, § 8. The only limitation which the Legislature placed on this mandatory requirement of repurchase is that no manufacturer, distributor, or dealer shall be required to repurchase any particular UFFI except "from the person to whom he sold it . . . ." G. L. c. 94B, § 8 (a) - (c). Pursuant to the authority delegated to the commissioner, the commissioner has the power to require that all UFFI be repurchased subject only to the proviso that no one shall be compelled to repurchase UFFI which it did not supply. This statutorily delegated power does not depend upon whether the consumer owned a UFFI insulated building, whether the UFFI was installed in the building, whether the request for repurchase was timely filed, whether the person adversely affected by the UFFI is an occupant or former occupant of the UFFI insulated building, whether an occupant or former occupant of a UFFI insulated building experienced adverse health symptoms, whether such symptoms occurred or were aggravated after exposure to UFFI as an occupant of a UFFI insulated building, whether such symptoms occurred while the occupant was present in a UFFI insulated building, or whether the occupant's symptoms are characteristic of exposure to formaldehyde. Thus, the commissioner's requirement that these eight issues be resolved through the referee procedure is purely gratuitous. Accordingly, the plaintiffs may not prevail on the contention that the commissioner was compelled to go further and require an adjudicatory hearing with respect to these issues. See discussion *infra* at 729-732.

Two consequences flow from our decision that a limited adjudicatory hearing is required. First, this right to an adjudicatory hearing requires that the supplier from whom repurchase is sought has the right to examine and cross-examine witnesses on the issue whether the company actually supplied the UFFI. Second, this right by necessity implies the concomitant right, exercisable prior to the hearing, to inspect the UFFI so that the supplier may determine whether there is a viable factual dispute on that point.

4. *Review of commissioner's regulations.* (A) *The ban regulations.* Unless an exclusive mode of review is provided by law, judicial review of agency regulations is to be gained through a petition for declaratory relief. G. L. c. 30A, § 7. There being no exclusive mode provided in G. L. c. 94B or elsewhere, an action for declaratory relief under G. L. c. 231A is the appropriate procedure to challenge the commissioner's regulations. Because we think that the plaintiffs failed to prove that the commissioner lacked any conceivable, rational basis for the regulations, we reverse the judge's ruling that the ban regulations are invalid.[7]

---

[7] The commissioner urges that it was error for the trial judge to deny his motion for summary judgment which was based on his contention, as stated in his brief, "that the evidence compiled in the administrative hearings unquestionably demonstrated that there was not only a conceivable, but an actual, basis for the Commissioner's action."

In *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844 (1977), we implicitly recognized that summary judgment may be appropriate in actions for declaratory relief "where litigation focuses on the power of an administrative agency to act as [it] did . . . ." *Id.* at 855. See *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456, 464 n.8 (1981), and *Shell Oil Co.* v. *Revere,* 383 Mass. 682, 688 n.11 (1981) (courts express no view whether summary judgment would have been appropriate in challenges to State law and municipal ordinance, respectively). See also *Commonwealth* v. *Leis,* 355 Mass. 189, 202 (1969) (Kirk, J., concurring). Cf. *Ciszewski* v. *Industrial Accident Bd.,* 367 Mass. 135, 139 (1975). Given the focus of the litigation here, however, we think the judge did not err in denying the motion. The plaintiffs do not challenge the power of the commissioner to ban hazardous products and to order repurchase. Rather, they contend that the commissioner had no rational, conceivable ground to ban UFFI on the basis of the current scientific information concerning its hazard and the dangers of formaldehyde. There was a material issue of fact, namely whether the state of scientific

We take this opportunity to set forth, once again, the guiding principles for judicial review of agency regulations. We begin by noting that an agency's power to make regulations is delegated by the Legislature. See *Pacific States Box & Basket Co.* v. *White,* 296 U.S. 176, 185-186 (1935); *Commonwealth* v. *Diaz,* 326 Mass. 525, 527 (1950). Acting upon this delegation, an agency may, unless specifically prohibited, properly base its regulatory decisions on the same kinds of "legislative facts" on which the Legislature could rely in its enactment of a statute. See 4 K.C. Davis, Administrative Law § 15.03 (1958). Cf. *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 79-80 (1979); *Cast Iron Soil Pipe Inst.* v. *State Examiners of Plumbers & Gas Fitters,* 8 Mass. App. Ct. 575, 586 (1979), and cases cited. A regulation is essentially an expression of public policy. See *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health, supra.* The issue on review is not whether the regulation was supported by substantial evidence in the record before the agency. *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n,* 387 Mass. 122, 126 (1982). *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health, supra* at 80. *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.,* 377 Mass. 282, 293 (1979). Indeed, "[f]acts represented in material submitted to an agency, unless stipulated as admitted, may not be relied on in a judicial challenge to an administrative regulation." *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health, supra*

---

information concerning UFFI and formaldehyde was such that the commissioner would have been arbitrary or capricious in relying upon it. We note that both at trial and before this court the commissioner has preferred to rest his argument essentially on the soundness of his regulations as based on the scientific information available to him rather than on a hypothetical but rationally conceivable basis. Given this posture of the commissioner's case, and given also the nature and complexity of scientific evidence, we think the judge acted properly in allowing the plaintiffs to proceed. We do not imply, however, that once trial had begun the plaintiffs were relieved in any way of their burden of proving that the commissioner lacked any rational, conceivable basis. We also do not intend to vouchsafe any general statement as to the appropriateness of summary judgment in other challenges to legislative or administrative actions.

at 81. Rather, the person challenging the regulation must prove in the judicial proceeding that the regulation is illegal, arbitrary, or capricious.[8] *American Family Life Assurance Co.* v. *Commissioner of Ins., ante* 468, 477-478 (1983). *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n, supra.*

Because the agency proceeding is not an adjudicatory one, cf. *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491 (1965), a plaintiff may not meet its burden "by arguing that the record does not affirmatively show facts which support the regulation." *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 776 (1980). *Colella* v. *State Racing Comm'n,* 360 Mass. 152, 156 (1971). "If the question is fairly debatable, courts cannot substitute their judgment for that of the Legislature." *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 136 (1949). A plaintiff must prove "the absence of any conceivable ground upon which [the rule] may be upheld." *Purity Supreme, Inc.* v.

---

[8] The plaintiffs contend that the court's function is "to determine whether there is any rational basis upon which the regulation can be sustained." We agree. However, we do not agree with the plaintiffs' contentions that in making this determination the court must view the regulations in light of the factors and standards required or deemed relevant under the Federal Administrative Procedure Act. While some of these factors are helpful, others are neither necessary nor appropriate under this State's Administrative Procedure Act. Cf. *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 80 (1979) (State agency need not make findings of legislative facts in the record of regulatory proceeding although Federal agency would be so required). The United States Supreme Court itself did not rely on these factors when it recently upheld the validity of State legislation banning the use of plastic, nonrefillable milk containers. *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456 (1981). Instead, the Court reviewed the State's claims for justification of the law and noted that it must uphold the legislation "[i]f any one of the four [reasons] substantiates the State's claim." *Id.* at 465. Finding that "in view of the evidence before the legislature, the question clearly is 'at least debatable.' *United States* v. *Carolene Products Co.,* 304 U.S. [144], 154 [1938]," the Court reversed the Minnesota Supreme Court's decision invalidating the ban and held that that court had "erred in substituting its judgment for that of the legislature" even though it may have been correct that the ban was not a "sensible means" of achieving the conservation goals that the Legislature had in mind when it enacted the law. *Id.* at 469.

*Attorney Gen., supra,*[9] quoting *Druzik* v. *Board of Health of Haverhill, supra* at 138. This is so because a properly promulgated regulation has the force of law, *Purity Supreme, Inc.* v. *Attorney Gen., supra* at 768, and must be accorded all the deference due to a statute. *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n, supra* at 127. "Thus, [a court] must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *American Family Life Assurance Co.* v. *Commissioner of Ins., supra* at 477, quoting *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977). This deference is necessary to maintain the separation between the powers of the Legislature and administrative agencies and the powers of the judiciary. "A court may not substitute its judgment for that of the Legislature if the regulation comports with the power delegated." *Purity Supreme, Inc.* v. *Attorney Gen., supra* at 776. This deference also precludes the possibility that a plaintiff may frustrate administrative policy merely by amassing facts, statistics, and testimony before a judge, all of which may have little or nothing to do with the legislative facts which the administrative agency relied upon in making its regulation. "[R]espect for the legislative process means that it is not the province of the court to sit and weigh conflicting evidence supporting or opposing a legislative enactment." *Shell Oil Co.* v. *Revere,* 383 Mass. 682, 687 (1981). *Clark* v. *Paul Gray, Inc.,* 306 U.S. 583, 594 (1939). Accord *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U.S. 456, 464 (1981). See *Sturges* v. *Chilmark,* 380 Mass. 246, 256-257 (1980); *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.,* 363 Mass. 474, 491 (1973) ("[F]or the court to check

---

[9] This is consistent with the fact that an agency is not, barring a specific statutory mandate, obliged to provide a statement of the reasons which support its adoption of a regulation. *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n,* 387 Mass. 122, 127 (1982).

back on the agency's 'reasons' and 'determination[s]' of fact and law would have an unhealthy tendency to substitute the court for the agency as policymaker").

We turn to the specific mandate here at issue. General Laws c. 94B, § 2 (*d*), as appearing in St. 1972, c. 506, § 1, provides that "[i]f the commissioner finds that an article subject to this chapter cannot be labeled adequately to protect the public health and safety, or the article presents an imminent danger to the public health and safety, he may declare the article to be a banned hazardous substance and require its removal from commerce."[10]   An article is subject to this chapter if it is a "hazardous substance" as defined in G. L. c. 94B, § 1,[11] or if the commissioner declares it to be a "hazardous substance" in accordance with G. L. c. 94B, § 2 (*a*).[12]   There are no requirements in G. L. c. 94B that the commissioner conduct any specific tests or determine that any specific number of people are or will be affected by a particular substance in making his finding concerning it. Nor is there any indication that the commissioner must hold an adjudicatory hearing before making his finding.   The commissioner may act only with respect to those substances

---

[10] There is no requirement in this section that the commissioner consider less drastic alternatives to a ban.

[11] General Laws c. 94B, § 1, as appearing in St. 1972, c. 506, § 1, defines "hazardous substance" in pertinent part as "any substance or mixture of substances which is toxic, corrosive, an irritant, a strong sensitizer, flammable or which generates pressure through decomposition, heat, or other means, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use . . . ."
The terms "toxic" and "irritant" are further defined elsewhere in § 1.

[12] General Laws c. 94B, § 2 (*a*), inserted by St. 1960, c. 727, § 2, provides, "Whenever in the judgment of the commissioner such action will promote the objectives of this chapter by avoiding or resolving uncertainty as to its application, the commissioner may by reasonable rules and regulations declare to be a hazardous substance, for the purpose of this chapter, any substance or mixture of substances which he finds meets the requirements of the same term as defined in section one."

concerning which he makes certain findings, but his power to make those findings is limited only in that he must not exercise it illegally, arbitrarily, or capriciously.

The judge found that "[f]ormaldehyde, . . . at some level of concentration, becomes an irritant. . . . [F]urther . . . as this abrasive level of exposure is increased, the exposure level becomes toxic." We accept this finding. Since formaldehyde meets the definition of hazardous substance, we conclude that formaldehyde is properly regulated under G. L. c. 94B. The crux of the issue before us, then, is — as it was before the judge — whether the presence of formaldehyde in UFFI justifies the ban of the latter product. The ban would be justified if the commissioner could rationally find that UFFI could not "be labeled adequately to protect the public health and safety, or [that UFFI] present[ed] an imminent danger to the public health and safety." G. L. c. 94B, § 2 (d).

We have in the past sustained regulations on the ground that there was a conceivable basis for the agency decision. *Colella* v. *State Racing Comm'n*, 360 Mass. 152, 157 (1971). See also *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 689 (1981) (upholding municipal ordinance banning self-service gas stations on basis of purposes which city could have had in mind). In this case, we need not go so far.[13] We have examined relevant portions of the trial transcript, and we conclude that there was evidence presented there which warranted the commissioner's action.

We briefly summarize portions of that evidence. At trial, Dr. Richard Gammage, a chemist, testified that tests conducted at the Oak Ridge National Laboratory on panels of wood foamed internally with UFFI and maintained under conditions which would approximate those of a corner room

---

[13] "We note that we are, of course, free to consider the evidence before the Commissioner, as well as any other relevant information, including that provided in the briefs in determining whether there was a rational basis for the Commissioner's regulations." *American Family Life Assurance Co.* v. *Commissioner of Ins.*, ante 468, 478 n.6 (1983).

in a normal house[14] indicated that UFFI emitted formaldehyde into the "room" in levels of concentration which ranged from .03 to about .25 or .3 parts per million. There was also testimony from Dr. George Allen, a professor of fiber and polymer science at the University of Washington, called by the plaintiffs, that a greater amount of formaldehyde is released from UFFI with increases in heat and humidity. The judge found that improper mixing or installation of UFFI could increase the rate of formaldehyde emission. Dr. Murray Cohn, a biochemist at the Consumer Product Safety Commission (CPSC),[15] testified that he conducted statistical tests to compare the average level of formaldehyde in houses that were insulated with UFFI with the average level found in houses not insulated with UFFI. His results indicated that the average level in houses insulated with UFFI was .12 parts per million whereas the average level in noninsulated houses was .03 parts per million.[16] He further testified that he found there was a ninety-eight percent probability that the difference in levels was real and not due to error in the statistical analysis. A report entitled "Formaldyde — An Assessment of Its Health Effects" prepared by the National Academy of Sciences and entered as evidence at trial stated that: "[T]he studies of public exposure to formaldehyde in indoor air suggest a wide range of sensitivity, with effects reported at 0.01-31.7 [parts per million]." Dr. Andrew Ulsamer, Director of the

[14] Dr. Gammage qualified this statement on cross-examination by testifying that if the house did not have the same type of construction as the test panels, it would not be appropriate to directly transpose the date to the house. He also testified that variables not taken into account in the tests could affect the utility of the test data in certain situations.

[15] Dr. Cohn testified in a private capacity and not as a representative of the CPSC.

[16] The judge noted that studies conducted by the department on 198 houses in Massachusetts whose occupants complained of various symptoms which occurred after installation of UFFI indicated that in twenty-one percent of the houses no level of formaldehyde was found, in seventy-eight percent of the houses the level was found to be .09 parts per million or less, and in all houses the level was less than .5 parts per million.

Division of Health Effects at the CPSC,[17] testified that his opinion, based on his review of the National Academy of Sciences report, was that "there are health effects of formaldehyde at relatively low levels, and if one considers the various sensitive populations that may be involved, that there may indeed not be a population threshold at any measurable level of formaldehyde within the general population."[18] He further testified that persons who suffer from asthma, chronic obstructive pulmonary diseases such as emphysema or chronic bronchitis, and persons who are allergic to formaldehyde, would suffer health effects at exposure to levels less than .1 parts per million. He estimated these groups to compose about ten percent of the population. Finally, he testified that all the symptoms, except ear irritation, that had been listed by the commissioner in his repurchase regulations as characteristic of exposure to formaldehyde were in fact characteristic of such exposure. The judge found that these symptoms were characteristic of exposure to formaldehyde and many other common causes as well. Thus, there was evidence before the judge indicating that UFFI would potentially in some conditions emit formaldehyde into houses at levels above which at least a significant portion of the population would experience adverse health effects.[19]

---

[17] Dr. Ulsamer testified solely in a private capacity.

[18] In his findings, the judge noted that a study conducted by a Dr. Alarie and relied on by the commissioner indicated, based on the doctor's extrapolations from animal research, that humans should be exposed to no more than .03 parts per million of formaldehyde in the indoor environment with a preferred level of .003 parts per million.

[19] The judge made a number of findings concerning these issues: "At the present state of the technical knowledge and expertise, there has been no showing that the ambient level of formaldehyde concentration in houses in which UFFI has been properly installed is significantly more appreciable or different than the level of formaldehyde in similar houses without UFFI. . . . Simply stated, I find as a fact that the present data bank on the toxicology of formaldehyde is too deficient to permit the fixing of exact toxicological standards for formaldehyde exposure based upon reasonable scientific certitude for either the many various industrial or residential environments. I find further that there is in fact a population threshold for the irritant effects of exposure to formaldehyde in houses. Moreover,

In light of this evidence, we cannot say that the commissioner acted arbitrarily or capriciously in banning UFFI.

from the toxicological evidence produced at trial, I find and conclude factually that residential exposure to formaldehyde at levels below 0.1 parts per million is an exposure beneath this undetermined population threshold. I further conclude, insofar as it is a question of fact, that from the data made available to the Commissioner and presently found within its administrative record there is no evidence upon which an agency fact finder would be warranted in concluding that the population threshold for irritant or toxic effects of exposure to formaldehyde is zero. . . .

"Therefore from the epidemiological evidence produced at the trial, insofar as the same is a question of fact, I find there has been no showing that the symptoms focused upon are more prevalent among individuals living in UFFI houses than any other group of residents."

The commissioner disputes the judge's interpretation of the evidence upon which he relied in making some of these findings. We need not enter the fray. However, we do note that these findings relate to facts demonstrable at the time of trial. As such, they do not refute that aspect of the commissioner's evidence at trial which indicated that UFFI potentially will release formaldehyde into buildings at levels greater than .1 parts per million. We think this evidence supports a rational determination that UFFI "presents an imminent danger to the public health and safety." G. L. c. 94B, § 2 (*d*). Certainly the commissioner need not wait until the danger materializes before taking action. See *Shell Oil Co.* v. *Revere*, 383 Mass. 682, 689 (1981) (upholding ban of self-service gas stations "[w]hether the ordinance was a response to actual instances of customer misuse or an attempt to forestall such problems . . ."). The commissioner has a statutory responsibility to "take cognizance of the interests of life, health, comfort and convenience among the citizens of the commonwealth." G. L. c. 111, § 5. Some doubts whether UFFI properly installed in houses will cause the symptoms characteristic of exposure to formaldehyde need not stay the commissioner's hand. Cf. *Commonwealth* v. *Leis*, 355 Mass. 189, 195 (1969) ("We do not think that the present unavailability of or inability to collect absolute, statistical and scientific proof that the smoking of marihuana (1) triggers 'psychotic breaks,' (2) leads to the use of more dangerous drugs and (3) causes automobile accidents prevents the Legislature from acting to prohibit its use"). Indeed, the commissioner might well have acted irresponsibly had he ignored the mounting evidence of the dangers of formaldehyde exposure. Cf. *Washington State Farm Bureau* v. *Marshall*, 625 F.2d 296, 306 (9th Cir. 1980), where the court stated that, "[g]iven [the Secretary's] clear statutory mandate to protect the children, it would have been reasonable — if not imperative — for him to prefer the advice of the more cautious expert opinions, which were based on an independent review of available data." The case involved the Secretary of Labor's regulatory ban of the use of certain pesticides. We note also that the Consumer Product Safety Commission has recently banned the use of UFFI in houses and schools. 47 Fed. Reg. 14,366 (1982) (to be codified at 16 C.F.R., part 1306).

That the commissioner was unable to determine the amount of formaldehyde that UFFI contributed to the indoor environment, that he did not know how many people in the Commonwealth had been affected by UFFI, that he had not compared the levels of formaldehyde in UFFI and non-UFFI houses, that he had not caused epidemiological studies to be made to determine the incidence of symptoms allegedly caused by UFFI, that experts called by the plaintiff at trial offered evidence contrary to the commissioner's, and that the commissioner's experts significantly qualified their testimony on cross-examination[20] does not obviate the fact that he had a rational and certainly conceivable basis for his decision.[21]

(B) *The repurchase regulations.* The plaintiffs contend that the commissioner's repurchase regulations are arbitrary and capricious because they fail to afford fundamental procedural safeguards. They do not contend that these regula-

---

[20] We can conceive of circumstances where scientific evidence could be so severely impeached as to render any reliance upon it unreasonable. This is not the case here, especially given the inherently tentative nature of most scientific inquiry.

[21] We find no relevance in the fact, if it is one, that, in the judge's words, the commissioner shifted "the burden away from the proponents of the ban and deposit[ed] it upon the industry without notice at the time of the hearing." The judge made this conclusion on the basis of statements in the commissioner's findings of which the following is an example: "Opponents have claimed that proper installation will eliminate formaldehyde . . . (but) . . . have not substantiated these claims with scientific tests or other evidence . . . (nor) . . . demonstrated UFFI can be properly installed. . . . Nor do I have evidence showing what installation procedure will control vapor problems or whether these procedures will eliminate vapor emissions from the insulation. I therefore cannot conclude that improper installation necessarily accounts for the formaldehyde problems experienced in UFFI."

While the commissioner's implicit placement of the burden on the industry may have consequences in the context of the adjudicatory hearing which the judge believed was required, the question of "burden" has no meaning in the context of a regulatory hearing. The mere fact that the commissioner couched his findings in language which would indicate that the industry had a burden of proof would not affect the appropriateness of his actions if, in fact, there existed a reasonable, conceivable basis to support them.

tions result in a taking of property in violation of their substantive due process rights. We have earlier stated that those suppliers of UFFI who are asked to repurchase the product are entitled to an adjudicatory hearing to determine whether the particular UFFI complained of was sold by them. In this section, we deal with the plaintiffs' other objections. The plaintiffs claim that the regulations are invalid because they prohibit the plaintiffs from showing the amount, source or relative level of any ambient formaldehyde in a house, or that no occupant of the house suffered UFFI related symptoms. These objections are more properly directed toward the statute from which the commissioner draws his power to issue the regulations. Once a substance has been banned as a hazardous substance under G. L. c. 94B, the supplier of the substance has the absolute obligation under G. L. c. 94B, § 8 to repurchase his product in accordance with regulations promulgated by the commissioner. The only questions that need be answered to establish this obligation are whether the product is a banned hazardous substance and whether the person from whom repurchase is sought was the supplier of the product. The fact that the product is banned forecloses the issue of causation in so far as repurchase is concerned.

In the present cases, the commissioner's regulations specify that the owner of a building insulated with UFFI is not entitled to a "Certificate of Right to Repurchase" if the alleged supplier requests review unless a medical referee determines that an occupant or former occupant did suffer adverse health symptoms characteristic of formaldehyde exposure while in a building insulated with UFFI, 105 Code Mass. Regs. 650.222 (E) (9) (a) (1980), and unless a legal referee determines that the person requesting repurchase is the owner of a building insulated with UFFI which was supplied by the party from whom repurchase is requested. *Id.* at 650.222 (E) (9) (b). The person seeking repurchase must submit certain specific information showing that he has met the prerequisites for repurchase and naming the supplier from whom repurchase is sought. The supplier

may submit evidence tending to show that these prerequisites were not met, and the person seeking repurchase may submit rebuttal evidence. *Id.* at 650.222 (E) (4), (5) & (6). Unless the record "clearly and convincingly demonstrates" that the prerequisites are not met, the person seeking repurchase shall be entitled to a "Certificate of Right to Repurchase." *Id.* at 650.222 (E) (9) (a), (b) & (c). The regulations thus limit the right of repurchase, when it is challenged, to those persons who are found to be entitled by this process. In this sense, the regulations define only the rights of the persons seeking repurchase, and the plaintiffs have no standing to challenge the manner in which these rights are determined. Their obligation to repurchase is defined by statute. The fact that the suppliers bear the burden of proof in the proceedings before the referees does not change the character of those proceedings into one which determines the rights, obligations, or duties of the suppliers.

The plaintiffs further contend that G. L. c. 94B, § 8, prevents the commissioner from requiring a supplier to repurchase other than from the person to whom the supplier sold the UFFI and that the regulations which would allow the owner to seek repurchase directly from anyone in the chain of manufacture, dealership, or installation are, therefore, invalid. We do not read that section, or the power delegated to the commissioner under it, so narrowly. Rather than a limitation as to who may be required to repurchase, this section is intended to establish the obligation of those in the chain of supply to repurchase such that the final obligation falls upon the manufacturer (or importer) who brought the product into the marketplace. The fact that a supplier lower in the chain was not required to repurchase does not negate the obligation of a supplier higher in the chain to do so when properly requested. In any event, a supplier who is required to repurchase may, in turn, require repurchase from the person who sold the product to it.[22]

---

[22] Each supplier in the chain may pass along, as part of the repurchase price, its "reasonable and necessary" expenses or charges connected with

The final challenge raised by the plaintiffs is that G. L. c. 94B, § 8, limits the cost of repurchase to a refund of the purchase price paid by the consumer.  The argument is that since repurchase of UFFI as defined in the regulations would require its removal from the buildings at a cost far in excess of the actual purchase price[23], the regulations are invalid.  However, it is clear from G. L. c. 94B, § 8 (a) - (c), that the Legislature intended to require reimbursement for "reasonable and necessary" expenses and charges in connection with returning the product to the manufacturer along the chain of supply.  We have already stated that the commissioner, by regulation, may cause the chain to begin at some point other than the supplier who finally sells the product to the consumer.  We think that the costs specified in the regulations are reasonably and necessarily connected with return of the product along the chain of supply and that the commissioner had the power to structure the regulations so as to pass these costs directly to the appropriate supplier.

5. *Inclusion of tripolymer in ban.*  The plaintiff C.P. Chemical argues that the commissioner acted arbitrarily and capriciously in that he included its product, tripolymer, within the ban of UFFI.  The gravamen of this argument is that a chemical called phenol is incorporated into the structure of tripolymer and that this chemical alters the chemistry of tripolymer to such an extent that it cannot be classified as a UFFI.  Moreover, C.P. Chemical claims that the incorporation of this chemical into tripolymer results in an

returning the product.  G. L. c. 94B, § 8 (a)-(c).  Because the commissioner's regulations would allow the number of suppliers who must handle the product before it reaches the top of the chain to be minimized, the regulation will, as a practical matter, probably result in a significant saving to the manufacturer (or importer) who must ultimately bear the final costs of repurchase.

[23] There was testimony at trial that the average cost to remove UFFI from an average seven room house in Massachusetts in the manner specified in the regulations would be as high as $25,000.  The judge found that the average cost would be between $12,000 and $14,000.

extremely limited potential for formaldehyde emission. We reject C.P. Chemical's arguments.

On November 1, 1979, the commissioner issued regulations which banned UFFI. As we stated above, these regulations are not arbitrary or capricious. In December, 1980, C.P. Chemical wrote to the commissioner stating the tripolymer was not a urea-formaldehyde foam insulation as defined in the regulations. The commissioner had determined that tripolymer was a UFFI product and was subject to the ban against all UFFI products and so notified C.P. Chemical. After trial in the Superior Court, the judge found that tripolymer was a UFFI product. He concluded that the introduction of the chemical, phenol, into the structure did not so alter the structure as to take it out of the UFFI family.

The question whether or not tripolymer is a UFFI product is not an issue to be determined ab initio by the court. Rather, the question before us is whether there is any rational basis for the commissioner's conclusion that tripolymer is a UFFI product. We conclude that there is a rational basis for the commissioner's decision.

The commissioner viewed the term urea-formaldehyde foam insulation as a generic term encompassing all foam insulation substances containing formaldehyde. The commissioner determined that tripolymer fell within the generic category of formaldehyde insulation products. This determination is supported by the affidavit testimony of an officer of C.P. Chemical who stated that tripolymer is within the generic category of UFFI products.[24] Moreover, C.P. Chemical's complaint alleges that it manufactured products used in the manufacture of formaldehyde-based insulation. At trial the same officer of C.P. Chemical testified that tripolymer contained some formaldehyde. Further, she testified that the finished tripolymer product released formaldehyde into the air. Additionally, an expert retained by C.P. Chemical admitted at trial that tripolymer contained

---

[24] This affidavit was read in evidence at trial.

formaldehyde, and that such formaldehyde could be released into the air. Another of C.P. Chemical's witnesses testified at trial that tripolymer could potentially release formaldehyde into the air. There was sufficient evidence on which the judge could find that the commissioner was not arbitrary or capricious in concluding that tripolymer is a UFFI product. This ends our inquiry.

As to C.P. Chemical's argument that tripolymer emits such a small amount of formaldehyde into the air that the commissioner's banning it is arbitrary and capricious, we refer to our discussion *supra* at 725-729, rejecting the same argument with respect to UFFI in general. Some doubts as to whether tripolymer will cause adverse health effects to consumers need not prevent the commissioner from acting to protect the public. Cf. *Commonwealth* v. *Leis,* 355 Mass. 189, 195 (1969) (lack of absolute scientific proof does not prevent regulatory action). The commissioner did not act arbitrarily or capriciously.

6. *Prejudgment of case.* The judge concluded that the commissioner had prejudged the case against UFFI. We hold that this conclusion is erroneous.

As we hold today, the proceedings before the commissioner in the cases before us were regulatory and not adjudicatory. One of the consequences which flow from this conclusion is that there is no constitutional, statutory, or common law requirement that the regulatory body commence its inquiry with a tabula rasa. The nature of the rule making process is such that one may reasonably contemplate that the regulatory body will, either on the basis of some external or internal impetus, determine that a potential problem exists and that further investigation is warranted to determine whether (1) such a problem does, in fact, exist and (2) some regulation is necessary to resolve the problem. *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.,* 363 Mass. 474, 486-487 (1973).

The rule making process is not an adversary process in which two or more competing parties phrase specific factual and legal issues for resolution by a decision maker. See

1 K.C. Davis, Administrative Law § 7.02 (1958) (discussing requirement of a trial to resolve disputed factual issues). Rather, the system is designed to inform a decisionmaker so as to allow him to render a decision on the basis of his expertise and on the basis of the information collected. *Cambridge Elec. Light Co.* v. *Department of Pub. Utils., supra* at 486-487. While the adversary process, being adjudicatory in nature, necessitates the impartiality of the decisionmaker, the rule making process, being legislative in nature, does not compel an absolutely indifferent decisionmaker. If the plaintiffs' argument were to prevail in this setting, the result would be to halt the rule making process because regulatory bodies would not commence investigations where the very decision to investigate would be fatal to any regulation promulgated pursuant to such an investigation.

Indeed, the Legislature has granted the commissioner specific authority to disseminate information to the public concerning hazardous substances when he believes there is a possible public health problem. G. L. c. 94B, § 9 (*b*). Moreover, under the State Administrative Procedure Act, the commissioner is required to give public notice which refers to the statutory authority under which the action is proposed and "either state[s] the express terms or describe[s] the substance of the proposed regulation . . . ." G. L. c. 30A, § 2, as appearing in St. 1976, c. 459, § 2. The purpose of this notice is to allow interested parties to provide information to the commissioner.

In the cases before us the commissioner gave notice which described the problem and stated that public hearings would be held to examine the potential health effects of UFFI. We cannot conclude that the commissioner's adherence to the enabling statute and to the State Administrative Procedure Act constituted a prejudgment of the case against UFFI.

The result we reach today on this issue is consistent with our characterization of the rule making process in *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474 (1973). In that case we said, "Presumably the

department already had an understanding of the billing, termination, and related practices of the gas and electric companies and also an idea of the customer problems related to those practices. The department was in search of current information and arguments as to industry wide experience to supplement and test its own knowledge and to help it shape a workable set of regulations if that was needed." *Id.* at 486-487. The same description adheres to the commissioner's action in the cases before us. The mere fact that the commissioner had some knowledge of the subject and decided to test such knowledge by conducting an investigation does not invalidate the regulations issued pursuant thereto. Therefore, we set aside the judge's conclusion that the case against UFFI was prejudged.

7. *Evidence of UFFI's carcinogenicity.* Our disposition of these cases renders it unnecessary to examine the admissibility of evidence concerning UFFI's potential carcinogenicity. However, because the significance of this issue transcends the instant cases, we shall address it.

The judge excluded evidence offered by the commissioner which tended to show that UFFI's emission of formaldehyde, even in low concentrations, could cause cancer in humans. The judge stated that he excluded the evidence because the commissioner disclaimed reliance upon it.[25] Given the posture of the cases, the judge should have admitted the evidence.

As we have stated above, a regulation promulgated by an administrative agency will be upheld unless the opponents prove at trial that there is no rational basis for the regulation. A court is not concerned with whether there was substantial evidence in a record before the agency, but rather it must determine whether the record made in court discloses that the adoption of the agency regulation was illegal, arbitrary, or capricious. *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n,* 387 Mass. 122, 126 (1982). Accordingly, the commissioner's statement that he did not

---

[25] See note 3, *supra.*

necessarily rely upon the evidence of UFFI's carcinogenicity for his decision to ban the substance does not preclude him from offering such evidence at trial to prove that there is a rational basis for his regulation. Moreover, although the commissioner is not compelled to establish affirmatively at trial that there is a rational basis for his regulation,[26] there is nothing in our previous cases to preclude him from doing so or to preclude him from introducing evidence before the judge on which he did not specifically rely at the administrative level.[27] Thus, we conclude that the judge should have admitted the evidence.

8. *Federal preemption.* The judge concluded that "there is no basis for the contention that federal law has preempted the field plowed by Chapter 94B." Of the plaintiffs in the cases before us, only one, C.P. Chemical, had alleged that the Federal law preempted the field. We note that C.P. Chemical has not briefed the issue of Federal preemption in this court. Therefore, we need not address the issue. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

9. *Other arguments.* C.P. Chemical argues that the retroactive application of the repurchase regulations violates the due process clause and the contract clause of the United States Constitution. Examining the two constitutional issues together, *American Mfrs. Mut. Ins. Co.* v. *Commissioner of Ins.*, 374 Mass. 181, 190 (1978), we reject the argument. An examination of the factors delineated in the *American Mfrs.* case compels the conclusion that the retroactive operation of the repurchase regulations is reasonable. See *id.* at 191. Cf. *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 29 (1977) (retroactive legislation disrupting contracts must be reasonable and necessary to

---

[26] Cf. *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776 (1980) (opponent may not sustain burden of proof by arguing that record does not affirmatively show facts supporting regulation); *Colella* v. *State Racing Comm'n*, 360 Mass. 152, 156 (1971) (same).

[27] See *American Family Life Assurance Co.* v. *Commissioner of Ins.*, ante 468, 478 n.6 (1983) (court may consider evidence before commissioner, as well as any other relevant information, in reviewing regulations).

serve important State interests). The public interest in eliminating the health hazard posed by the presence of UFFI in houses overrides the interests of the suppliers of UFFI in the integrity of a contract. We cannot say that the commissioner was unreasonable in concluding that repurchase was the most effective remedy available.

Likewise, we are not persuaded by C.P. Chemical's argument that the ban and repurchase regulations are unconstitutionally vague because they do not contain a definition of UFFI. See generally *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 134 (1949) (penal regulation must be clearly expressed so as to give guidance to those purportedly subjected to it). The commissioner declared "urea-formaldehyde foamed-in-place insulation" to be a banned hazardous substance and ordered it to be removed from commerce. 105 Code Mass. Regs. 650.020 (1979). The commissioner was not constitutionally required to incorporate the chemical definition of urea-formaldehyde foamed-in-place insulation into his regulations — the absence of such a definition does not render the regulations vague.

10. *Conclusion.* We conclude that the judge erred in holding that the commissioner's ban and repurchase regulations were illegal, arbitrary, and capricious. Accordingly, we reverse the judgments of the Superior Court and remand the case with directions to grant declaratory relief consistent with this decision.

*So ordered.*